[No. S004260. Crim. No. 20879. Sept. 5, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD LEE BELL, Defendant and Appellant.

510

COUNSEL

Frank O. Bell, Jr., and Harvey R. Zall, State Public Defenders, under appointment by the Supreme Court, Peter R. Silten and Philip M. Brooks, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Herbert F. Wilkinson, Ronald S. Matthias, Martin S. Kaye and Eugene W. Kaster, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**EAGLESON, J.**—Defendant and appellant, Ronald Lee Bell, was convicted by a jury in the Contra Costa County Superior Court of the first degree murder (Pen. Code, §§ 187, 189)[1] of Raymond Murphy; of attempt to murder John Benjamin (§§ 664, 187); and of robbery (§ 211). The jury also found that the murder had been committed under the special circumstance of murder during the commission of robbery (former § 190.2, subd. (c)(3)(i)); that defendant used a firearm in the commission each of those offenses (§ 12022.5); and that he inflicted great bodily injury in the commission of the attempted murder and robbery (§ 12022.7). Finally, the jury convicted defendant of possession of a concealable firearm by an ex-felon (§ 12021).

The offenses of which defendant was convicted occurred on February 2, 1978. Defendant was charged and convicted of murder with special circumstances under the 1977 death penalty law. (Stats. 1977, ch. 316, §§ 4-14, pp. 1256-1262; former §§ 190-190.6.) Following a trial which commenced on October 26, 1978, a prior jury had convicted defendant of the section 12021 violation, but had been unable to reach a verdict on the other charges. The trial court granted defendant's motion for new trial on the firearm charge, and a second trial leading to the conviction on all counts commenced on December 11, 1978, before a new jury which rendered its guilt phase verdicts on December 21, 1978.[2] After a penalty trial commencing January 8, 1979, that jury rendered a penalty phase verdict of death on January 16, 1979.

The court denied defendant's motion for modification of the penalty (§ 190.4), and on March 2, 1979, imposed judgment sentencing defendant to death for the murder of Raymond Murphy, to a seven-year term for attempted murder of John Benjamin, with enhancements of two years for firearm use and three years for infliction of great bodily injury, and to a consecutive term of two and two-thirds years for the robbery. No term was imposed for the firearm-possession conviction, the court stating that the term was stayed permanently.

---

[1] Unless otherwise specified all statutory references herein are to the Penal Code.

[2] The foreman had reported on December 20, 1978, that after three ballots the jury had been unable to reach a verdict, and had stated that she did not believe the jury would be able to profit from further deliberations. Some jurors felt that further deliberations on the following day should be attempted. On December 21, 1978, the jury requested that some exhibits be sent to the jury room and that the testimony of one witness be read. At 4 p.m. the jury reported that some verdicts had been reached, but asked for further explanation of the instructions on special circumstances,. premeditation, and "count two." The court supplied the jury with written copies of the instructions and agreed to answer further questions if they were not adequate. The jury returned its verdicts on all counts that evening at 7:45 p.m.

Defendant's appeal is automatic. (§ 1239, subd. (b).) In a prior opinion filed on December 3, 1987, this court affirmed the judgment in all respects. Rehearing was granted, however, when it appeared on consideration of defendant's petition for rehearing that the record on appeal submitted to this court by the Clerk of the Contra Costa County Superior Court differed in pagination, volume designation, and in minor respects in content from that in the possession of the People and defendant. As a result, this court's rejection of defendant's claim regarding the constitutional propriety of the procedure by which his jury had been selected may have rested on a faulty factual premise.

Pursuant to a stipulation by the parties that the record in possession of the Attorney General is complete and that copies of the volumes of reporters' transcripts included therein made by the clerk of this court shall be deemed the entirety of such transcripts in the original record on appeal, the record on appeal in this court has been supplemented with those copies.

Having reconsidered defendant's claims in light of the corrected record on appeal, we again affirm the judgment.

I

THE PROSECUTION CASE

Raymond Murphy managed Wolff's Jewelry Store in Richmond. John Benjamin was employed in the store as a driver and helper. A watch repairman working in the rear of the store on February 2, 1978, heard two "bangs" that he thought were the sounds of a car backfiring, one about two seconds after the other, about 4 p.m. He completed the work he was doing and then went to the front of the store where he briefly glimpsed someone going out the door. He also saw a young girl in the store at that time. Raymond Murphy was lying on the floor behind the east counter, apparently dead. Benjamin was lying on the floor behind the west counter. A showcase of rings near Benjamin was in disarray, its sliding glass doors open.

An inventory following the robbery-murder revealed that property with a value in excess of $30,000 was missing. Among the missing items was a number of rings. The assistant general manager of the company which owned Wolff's Jewelry Store testified that Wolff's held the copyright on a "Love Story" ring, approximately 30 of which rings were in Wolff's stores in the Bay Area. At trial he identified one such ring which had a break in its shank to reduce its size, and on which the initials "L. B." had been engraved by an amateur, as a ring taken during the February 2, 1978, robbery.

That ring had been found in the possession of Larry Bell following his arrest on an unrelated charge on February 9, 1982.

Raymond Murphy had been shot in the right side of the neck. The bullet severed the external jugular vein before striking the trachea, passing through the upper lobe of the left lung, and fracturing a rib. The gross injuries and hemorrhage, with apparent asphyxiation by blood in the respiratory tree, caused his death. Benjamin had been shot at close range with a .38-caliber weapon fired at a distance of no more than three feet. The slug removed from each victim had been fired from either a .38-caliber special or a .357-caliber magnum. Both could have been fired from a revolver, and although that taken from Murphy could have been fired from either a revolver or a semiautomatic handgun, the groove marks were consistent with a slug discharged from a .38-caliber Colt "Detective Special" with a two-inch barrel. Defendant's father, Richard Bell, testified that defendant's younger brother Larry had given him (Richard Bell) a .38-caliber handgun as collateral for a loan in December 1977. About a week later, defendant told his father that Larry had authorized him to reclaim the gun. Defendant paid his father $50, and had been given that gun, which his father had described to an investigator as a Colt with a two-inch barrel.

No physical evidence or fingerprints at the scene linked defendant to the crimes. He was identified as the killer, however, by an eyewitness to the shooting, Dorothy Dorton, age 13, who with her 14-year-old aunt, Ruby Judge, had been in the store at the time of the robbery and murder. He was also identified by an adult, Ernestine Jackson, the sister of Ruby and aunt of Dorothy, who spoke to him as he walked by her parked car toward the jewelry store and, 15 minutes later, saw him walk away from the area in front of the store carrying a plastic bag she had not seen earlier.

Because the strategy of the defense was to attempt to establish that Larry Bell had committed the crimes, and that these eyewitnesses were biased with a motive for implicating defendant, we describe in some detail their testimony and relationships.

Ernestine Jackson had known both defendant and Larry Bell for at least 10 years. She attended junior high school and high school with defendant, and had also attended school with Larry. For some time she had lived only two and one-half blocks from the Bell home. She was able to distinguish the brothers. Larry was taller and had a lighter complexion than defendant. However, in recent years she had seen defendant only "a couple of times," and Larry "every now and then."

Ernestine had driven to Wolff's Jewelry Store about 4 p.m. on the day of the crimes to pick up a watch that was being repaired. Ruby, Dorothy, and

four-year-old Alicia Carter, another niece, were with her in the car. She parked in a red zone close to the store and waited while Ruby went in to pick up the watch. As she waited she observed defendant approaching, opened her window, and greeted him, saying "How're you doing, Ronnie Bell." He asked who it was and when she said "Ernestine," greeted her, and continued walking toward the jewelry store. Ernestine then told Dorothy that defendant was the man who had killed Dorothy's father. Dorothy then said that she was going to get a good look at him and left the car.

When Ernestine later saw defendant leave the area of the store carrying what appeared to be a beige and white plastic bag, cross the street, and then run out of sight as he turned a corner, she herself went to the jewelry store where Dorothy told her that two men had been shot. Ernestine called the police from a store next door. She later identified a photo of defendant as the person she had spoken to prior to the robbery. She also identified him at trial.

Dorothy did not know defendant, but was aware and had discussed with family members the fact that he had killed her father when she was very young. She had no recollection of her father, remembering only the funeral.

Dorothy testified that she had entered Wolff's Jewelry Store because she saw that the man who had greeted Ernestine had not walked past the store and concluded that he was inside. Defendant was waiting to be helped. Ruby was being helped by a man who was writing out a receipt. Dorothy walked over to Ruby and told Ruby to ask defendant if his name was "Larry." Ruby did so. Defendant replied "no." When Ruby went to the back of the store to pay for the watch, defendant asked Benjamin to show him a ring, which defendant tried on and returned. Dorothy went to the rear to join Ruby, at which point defendant drew a gun from his waist, told Benjamin to "hold it," shot Benjamin, and then turned and shot Murphy. Neither victim had made any attempt to restrain defendant, who, after the shooting, scooped up some jewelry which he put in a blue bag bearing the name Wolff's in white lettering. Defendant walked out of the store after telling Dorothy to "get some jewelry." At the instructions of a woman who worked in the store, Dorothy then pushed an alarm button.

Dorothy subsequently identified a photo of defendant without hesitation or difficulty, stating that she was looking for a photograph of defendant. She testified at trial that she was positive the person she had seen in the jewelry store was defendant, and was not Larry. She had seen Larry in the past and could distinguish the brothers. She identified two photos of Larry at trial, and also testified that Larry was taller, and had lighter skin.

Ruby testified that she saw defendant enter the jewelry store after she had handed the receipt for the watch to a man wearing a blue suit who directed her to the rear of the store to make payment. She saw Dorothy follow defendant into the store. Ruby testified that she had asked defendant if his name was "Ronnie Bell," to which defendant had replied "no." Ruby also saw defendant examine and return a ring to a man at the counter; remove a gun from his waistband; shoot the man to whom he had returned the ring and who had neither offered resistance nor threatened defendant; and turn toward and shoot another man in the store. She saw defendant scoop up jewelry and place it in a white bag with blue lettering, and heard him tell Dorothy to "get some jewelry."

Ruby was familiar with both defendant and Larry, and with their home which was near an elementary school she had attended. She had identified a photograph of defendant in a photo lineup, and was also able to distinguish defendant and Larry, the latter being taller and lighter. She was positive in her identification of defendant as the person she had seen in the jewelry store. Both Dorothy and Ruby disclaimed any animosity toward defendant for killing Dorothy's father.

The People also presented evidence that, with the exception of a 30- to 45-minute absence, from early afternoon on February 2, 1978, until 10:30 to 11 p.m. of that date, Larry Bell had been with a woman in a motel located more than a mile from Wolff's Jewelry Store. While there the couple "shot up cocaine." The period when Larry Bell was absent was at a time when it was dark or near dark. Larry Bell did not have a gun with him in the motel room. Evidence was also presented that while defendant was five feet and six inches tall, and weighed one hundred twenty-eight pounds at the time of his arrest, Larry Bell was at least five feet and eleven inches tall, and had large arms, a big chest, and well-defined muscles.

## II

### The Defense

The primary defense theory was that defendant's brother, Larry Bell, had committed the crimes and had been mistaken by the eyewitnesses for defendant.

The principal defense witness was Dr. Robert Shomer, a psychologist specializing in eyewitness identification and the effect of reinforcement and/or suggestion in forming and changing attitudes. Dr. Shomer testified as an expert regarding the manner in which Ernestine, Ruby, and Dorothy may have been influenced in their identification of defendant, and his belief

that the child witnesses had been confused and uncertain initially whether the perpetrator of the offenses was Larry or defendant. In the opinion of Dr. Shomer, the manner in which investigating officers had interviewed these witnesses suggested to them that their belief defendant was the perpetrator was correct and resolved that uncertainty. He questioned the validity of the identifications by all of the eyewitnesses, concluding for a variety of reasons that it was highly unreliable.

Dr. Shomer's conclusion was based on his observation that Ernestine, Dorothy, and Ruby were all related to a man whom defendant had killed, and thus each had a reason to be biased and to believe defendant capable of committing violent acts. Their claim that they bore defendant no ill feeling was unrealistic and might indicate strong, unconscious hostility. Ruby had told an investigating officer that defendant belonged in the electric chair, strengthening the impression that she was, in fact, hostile. Dorothy was predisposed to identify the perpetrator as defendant because she had been told by Ernestine that the person she had seen was Ronnie Bell who had killed her father. Ruby's uncertainty as to the man's identity was demonstrated by her asking the man in the jewelry store his name, and young teenagers' testimony is generally less reliable. In this case comments made by a detective which suggested his belief that defendant was the perpetrator could have influenced them, and there had been discrepancies in their testimony regarding the clothing worn by the man they had seen.

Defendant also presented evidence that when arrested on February 9, Larry Bell possessed not only the "Love Story" ring described above, but two other rings as well. Larry was not called to testify as a witness or for the purpose of permitting the jury to view him. Defendant's wife testified that Larry was only an inch and a half taller than defendant, but acknowledged that Larry had lighter skin and was more muscular than defendant.

Defendant also presented the testimony of Thomas Boyden, that on February 5, 1978, about 11:15 p.m., Larry Bell had accosted Boyden and Clarence McIntosh as they sat in a car. Larry Bell told McIntosh to roll down the window and stuck a gun through the window when McIntosh refused. Larry put the gun to Boyden's head, but McIntosh grabbed the gun as Boyden heard a click indicating the trigger had been pulled. The gun was similar to an exemplar People's exhibit.

Finally, an investigator testified that it would have been possible to walk from the motel at which Larry Bell had been staying on February 2 to Wolff's Jewelry Store in from 13½ to 17 minutes, and the motel manager testified that the registration card bearing Larry Bell's name indicated that he had checked into room 6 at 3:04 p.m. for 3 hours. On a People's exhibit,

that the witness had certified as a copy of the registration card, the room number had been crossed out and a "10" substituted, with the time shown as 1:45. The card did not indicate the time the person left or whether he had come and gone during the time the room was rented to him.

## III

### PENALTY PHASE EVIDENCE

Evidence of three prior instances of assaultive conduct by defendant was offered. On October 15, 1968, defendant shot and killed Alcus Dorton. Defendant expressed anger when Dorton put his arm around defendant's girlfriend. He threatened to go home and get his gun, and shot Dorton, who had been drinking, after Dorton followed him home and attempted to push his way into defendant's home.

On May 3, 1974, defendant and Bobby Ingram had a fist fight when defendant made advances to Ingram's wife. Ingram got the best of the fight, and struck defendant again after defendant had apologized. After the fight defendant ran to his car where he displayed a pistol. Later in the day three shots were fired through Ingram's front door as Ingram went to answer a knock. Looking from a window, Ingram saw defendant enter a car and drive away.

In June 1974 defendant offered to sell Violet Clark a revolver which she recognized as similar to one stolen from her home two weeks earlier. She refused to buy it, and later as she left the bar where the offer had been made, defendant fired a shot in the direction of her car.

In mitigation defendant offered evidence that he had suffered two head injuries as a child, and that a mental-status examination reflected significant brain damage, disturbance in the ability to retain and reason verbally, and abnormalities in areas of his brain, all of which impaired defendant's ability to think abstractly. This permanently affected his personality and actions toward society. Defendant would function well in a structured setting such as prison, however.

Evidence of defendant's family relationships was presented in the form of testimony by his sister and wife who expressed the love that his family and children feel for him.

## IV

### JURY ISSUES

*Contra Costa County Jury Selection Procedures.*

Defendant contends that the procedure by which the Contra Costa County Jury Commissioner summons from the pool and forms venires of prospective jurors for weekly assignment to trial courts results in panels on which Blacks are underrepresented, and that the imbalance is the product of a systematic exclusion of Black residents of that county.[3] On this basis he argues that he was denied his right under the Sixth Amendment to the United States Constitution, and article I, section 16, of the California Constitution, to trial by an impartial jury drawn from a representative cross-section of the community. More specifically, his claim is that the evidence he presented during a hearing prior to his first trial established a prima facie violation of the fair cross-section requirement, thus shifting to the People the burden of rebutting that showing.

■■ ■■ ■■ The People both dispute defendant's claim that a prima facie violation was established, and argue that the issue is not one preserved for appeal from the judgment imposed following the second trial because defendant did not demonstrate that the selection procedures at that trial were defective and/or that the panel from which the petit jury that actually convicted him was drawn was underrepresentative.[4]

We shall address defendant's claim on the merits. Although, technically, the motion was raised at the first trial which ended in a mistrial, the trial

---

[3] To avoid the confusion arising from the imprecise and interchangeable use of terms, we adopt the usage proposed by respondent. The jury "pool" is the master list of eligible jurors compiled for the year or shorter period from which persons will be summoned during the relevant period for possible jury service. A "venire" is the group of prospective jurors summoned from that list and made available, after excuses and deferrals have been granted, for assignment to a "panel." A "panel" is the group of jurors from that venire assigned to a court and from which a jury will be selected to try a particular case.

[4] The People do not contend that defendant was required to show that his *petit jury* itself was underrepresentative, nor was such a showing required. A criminal defendant who asserts a systematic exclusion of a cognizable class of prospective jurors in a pretrial challenge to the jury venire or panel need not show that his trial jury was underrepresentative. The injury from such jury selection practices "is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts." (*Ballard* v. *United States* (1946) 329 U.S. 187, 195 [91 L.Ed. 181, 187, 67 S.Ct. 261]; see also *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217, 225 [90 L.Ed. 1181, 1187, 66 S.Ct. 984, 166 A.L.R. 1412].) Although *Ballard* and *Thiel* involved departure from statutory jury selection standards, the court has since indicated that the rule applies to constitutionally based challenges as well. (*Duren* v. *Missouri* (1979) 439 U.S. 357, 364 [58 L.Ed.2d 579, 587, 99 S.Ct. 664].)

court thereafter ruled that all motions made at the first trial would be deemed to have been renewed and ruled upon in the same manner at the second trial.

1. *Composition of the 1978 Master Jury List and Weekly Panels in Contra Costa County.*

The motion challenging the method of jury selection was first made and denied without prejudice to renewal on October 27, 1978, the second day of the first trial, and was renewed on November 1, 1978, after the jury had been selected. At the hearing on the renewed motion the Contra Costa County jury commissioner testified regarding the manner in which jurors are procured, and how the prospective jurors sent to the courtroom for defendant's jury selection had been chosen.

His undisputed testimony reveals this sequence of juror selection. The jury commissioner oversees the procurement of jurors for the year's jury pool, and summons jurors on a weekly basis as needed by the courts. The master jury list for the year is compiled from the Department of Motor Vehicles' list of persons holding driver's licenses or identification cards, as well as the voters registration list. After a computerized "merge" of the lists, a computer process creates a file of names adequate to supply the projected number of persons it will be necessary to qualify as jurors for the coming year. Affidavits are sent to these persons for completion and return to determine if the person is qualified for jury service. In 1978, 30,000 affidavits were sent, and 15,000 respondents were found to be qualified and placed on the master list for the year.

When the data processing unit is advised of the number of prospective jurors who will be needed for a given Monday, a computer selects the names from the master list using a random process. Summonses are then sent to those people. For Monday of the week defendant's first trial was to begin summonses were sent to 468 persons, of whom approximately 290 appeared at the roll call on October 23, 1978. Two hundred and two did not respond or had been deferred prior to the Monday roll call. Deferrals were granted pursuant to "Code of Civil Procedure section 202"[5] on grounds of hardship

---

[5] Actually, Code of Civil Procedure section 202 had been repealed in 1975 (Stats. 1975, ch. 593, § 6, p. 1310 ). Code of Civil Procedure former section 200 (see now § 204, subd. (b)), adopted in that year, provided: "The court shall excuse a person from jury service upon finding that the jury service would entail undue hardship on the person or the public served by that person."

Code of Civil Procedure former section 201a required the superior court of each county to "adopt written rules and regulations supplementary to such rules as may be adopted by the Judicial Council establishing a procedure whereby the jury commissioner of said county or city and county shall be empowered to grant excuses from jury service to such prospective ju-

to the person called or to the public. Deferral does not necessarily excuse service, but may postpone service to a later date.

Among the reasons for deferral accepted by the jury commissioner and the members of his staff who made such decisions were medical problems or illness, business hardships, absence from the county or state, financial hardship, and inability to arrange child care. Transportation problems were considered an aspect of financial hardship. The jury commissioner could interview a prospective juror seeking deferral and might require written support for the claimed basis for deferral. *Race and sex of the prospective juror were not to be taken into account in granting deferrals. The jury commissioner and his staff followed a "very firm policy" that no juror be rejected because of political affiliation, religious faith, race, color, social or economic status, occupation, or sex.* The racial composition of a particular panel assigned to a trial department is random.[6]

The commissioner's records of the October 23, 1978, panel showed that 23 persons had not appeared and had not been excused. Second notices had been sent to those persons. The post office returned the summonses sent to 17 persons as undeliverable or indicated that these persons had moved from the county. Business hardship was given as the reason forty-seven persons were excused; nine were excused for reasons related to financial hardship; eight were excused because of family or child care problems; forty-three were excused for medical reasons; two were not qualified, having suffered felony convictions; one was in the Navy; twenty-seven were on vacation or out of the county, including students attending schools out of the area; one was excused because of inability to understand English; one had a "judicial excuse"; and one had a conflicting court appearance.

---

rors who in the opinion of the jury commissioner qualify for excuses under Section 200." Although the jury commissioner had established an oral policy and some memoranda had been prepared, at the time of the hearing no formal written policy had been adopted in Contra Costa County.

Code of Civil Procedure former section 246 (see now § 218) provided further: "At the opening of court on the day trial jurors have been summoned to appear, the court, or jury commissioner shall hear the excuses of jurors summoned; provided, that it may be left to the discretion of the court to accept an affidavit of excuse or other excuse under Section 200 without a personal appearance in court of the juror summoned. The court shall select jurors from this panel for the voir dire process in a manner to insure random selection."

[6] Code of Civil Procedure former section 203 required each court to adopt rules "governing the selection of persons to be listed as available for service as trial jurors. The persons so listed shall be fairly representative of the population in the area served by the court, and shall be selected upon a random basis. Such rules shall govern the duties of the court and its attachés in the production and use of the juror lists. . . ."

Code of Civil Procedure former section 204.5, subdivision (b) (see now § 198), enacted in 1980, specified that "[t]he names of jurors to be placed on the master jury list shall be selected by the jury commissioner at random from the source lists. The plan for random selection used shall be in writing and shall be designed to insure the random selection of a fair cross section of the persons residing in the area served by the court."

After the Monday morning roll call another 25 to 30 persons were excused for similar reasons, leaving a panel of 266 available prospective jurors. The experience with the October 23, 1978, panel was consistent with the excusal rate for those categories for any other week. Of the two hundred sixty-six prospective jurors available for that week, all, with the possible exception of three, were assigned to courtrooms for the six trials, including that of defendant, anticipated for the week. On October 26, 1978, 80 prospective jurors were assigned to the department in which defendant's trial was conducted.[7]

A 1977 document entitled "Contra Costa County, A Profile," prepared by the Contra Costa County Planning Department, and containing some demographic characteristics of the county, was admitted in evidence. That document, based on the 1975 census, reflected a county population of 582,820 in 1975. The population of Richmond was 70,126, or approximately 12 percent of the total population. The total Black population of the county was 45,452, and of Richmond was 28,956. Thus, approximately 63.7 percent of the Black residents of the county lived in Richmond. The Planning Department report did not, however, break down the Black population in Richmond between persons below 18 years of age and those 18 and over, i.e., the potential jury-eligible Black population, and the jury commissioner had done no study to establish those statistics.

The commissioner believed that defense counsel was correct in his assertion that of the 468 persons who were called for jury duty on October 23, 1978, 6.6 percent were from Richmond, and 7.5 percent of the panel assigned to defendant's trial were from Richmond.

The jury commissioner had addressed each Monday morning panel of prospective jurors that had been assembled since he assumed his office in April 1978. He believed that on Monday, October 23, 1978, there were a "few" potential Black jurors among the persons summoned. In an average week there would be between five and ten potential Black jurors and this week appeared to him to be an average week. As a "guess" the average number of Blacks would be six (or less than 3 percent) in a weekly panel. The only difference in the October 23, 1978, panel was its size, slightly larger than usual because more persons than the customary 430 had been summoned.[8]

---

[7] Of these 80 persons, several did not appear on that date, and 32 more were subsequently excused in response to challenges or, on the court's motion, for reasons similar to those accepted by the jury commissioner.

[8] The trial of the defendant in *People* v. *Buford* (1982) 132 Cal.App.3d 288 [182 Cal.Rptr. 904] took place in Contra Costa County in January 1979, approximately three months after Bell's first trial. The *Buford* court, in considering a similar challenge to the county's jury selection process in operation in late 1978-early 1979, took judicial notice of much of the above-described evidence introduced on the issue in this case. (*Id.* at p. 291.)

## 2. Defendant Failed to Make a Prima Facie Showing of Systematic Underrepresentation Under Duren.

 Defendant did not offer any evidence other than statistical evidence of underrepresentation of Blacks on jury venires over a six-month period, and the testimony of the jury commissioner regarding the manner in which jurors were summoned, excused, and the weekly venires made up. That evidence established that, although the county was not in compliance with statutory requirements for written policies, the selection criteria in use were neutral with regard to race, ethnicity, sex, and religion. Defendant did not identify any aspect of the selection process as the probable cause of the disparity. Even with regard to his speculative assertion that hardship deferrals were responsible, he did not offer any evidence to suggest that these deferrals were constitutionally suspect. We shall conclude, therefore, that defendant failed to carry his burden of establishing a prima facie case under the third prong *Duren* v. *Missouri, supra,* 439 U.S. 357, 364—that this underrepresentation was due to "systematic exclusion" of Blacks in the jury selection process.

Notwithstanding its length, and its forceful articulation of the importance of the right to trial by a jury drawn from a representative cross-section, with which we agree entirely, the sole substantive area of disagreement between Justice Broussard and ourselves is the nature of the "systematic exclusion" that a defendant must demonstrate to establish a prima facie violation of his Sixth Amendment right to a jury drawn from a representative cross-section of the community.

Unlike Justice Broussard we do not understand the United States Supreme Court to have created such a minimal burden that a defendant need demonstrate only that underrepresentation has occurred over a period of time, upon which the court must presume that a constitutional defect is inherent in the system unless the People rebut the presumption. Rather, we conclude, that when a county's jury selection criteria are neutral with respect to race, ethnicity, sex, and religion, more is required to shift the burden to the People. The defendant must identify some aspect of the manner in which those criteria are being applied that is: (1) the probable cause of the disparity, and (2) constitutionally impermissible.[9]

---

[9] Acceptance of the dissent's formulation of the *Duren* requirements would impose unreasonable costs on the judicial system in the expenditure of courtroom time, delays in criminal prosecutions, and expense to the People. In every criminal case in a county in which members of a cognizable class were underrepresented on jury venires, a challenge could be made, a hearing would have to be held, and the People would have to gather and obtain evidence to

■ The Sixth Amendment guaranty of jury trial encompasses the right in issue here—a right to trial by an impartial jury drawn from a representative cross-section of the community.[10] In two prior cases this court considered the manner in which procedures for compiling master jury lists and for selecting the trial jury might impermissibly impinge on that right. (*People* v. *Harris, supra,* 36 Cal.3d 36 [composition of the master list]; *People* v. *Wheeler, supra,* 22 Cal.3d 258 [use of peremptory challenges].) Our focus in this case is on the intermediate stage of jury selection; the composition of panels from the master list for assignment to courtrooms in which a trial jury will be selected. If a defendant establishes a prima facie violation of the fair cross-section right guaranteed by the Sixth Amendment at this stage of jury selection, the burden shifts to the People to rebut the showing made by the defendant.

■ In *Duren* v. *Missouri, supra,* 439 U.S. 357, the United States Supreme Court defined the elements of that prima facie showing, creating a three-prong test: "In order to establish a prima facie violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process." (*Id.* at p. 364 [58 L.Ed.2d at pp. 586-587].)

■ As we have noted, a defendant need not show that the particular panel or panels assigned to the court in which his jury is to be selected are underrepresentative. (*Ballard* v. *United States, supra,* 329 U.S. 187, 195; *Thiel* v. *Southern Pacific Co., supra,* 328 U.S. 217, 225.) Indeed, in many cases, particularly lengthy capital prosecutions, several panels are assigned to a courtroom during the selection of the trial jury, and those panels in turn may have been selected from several weekly venires.[11] As the Supreme

---

establish that the defendant's statistics were inaccurate, or that there was no aspect of the selection process that was either constitutionally impermissible or the cause of the disparity.

All of this would be required even though there was nothing more than underrepresentation itself to suggest that an actual infringement of the defendant's Sixth Amendment rights was occurring.

[10] The same right exists under article I, section 16, of the California Constitution. (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 272 [148 Cal.Rptr. 890, 583 P.2d 748].) In determining the issue crucial to this case, whether systematic exclusion of a cognizable class of prospective jurors has been established, the federal and state jury trial guaranties are coextensive, and the analysis identical. (See, e.g., *People* v. *Harris* (1984) 36 Cal.3d 36, 48-49 [201 Cal.Rptr. 782, 679 P.2d 433].) Therefore, our reference to the rights guaranteed by the Sixth Amendment includes also those guaranteed by article I, section 16.

[11] In this case, however, defendant's evidence established that the venire from which his panel was assigned had a composition typical of the weekly venire created over a period of several months.

Court explained in *Duren,* the defendant's burden is to show that "the representation of [the] group *in venires from which juries are selected* is not fair and reasonable in relation to the number of persons in the community; . . ." (*Duren* v. *Missouri, supra,* 439 U.S. at p. 364 [58 L.Ed.2d at p. 587], italics added; see also *Bradley* v. *Judges* (9th Cir. 1976) 531 F.2d 413, 415, fn. 3; *Rabinowitz* v. *United States* (5th Cir. 1966) 366 F.2d 34, 59; *Rubio* v. *Superior Court* (1979) 24 Cal.3d 93, 108, fn. 10 [154 Cal.Rptr. 734, 593 P.2d 595], dis. opn. of Tobriner, J.; *Montez* v. *Superior Court* (1970) 10 Cal.App.3d 343, 348-349 [88 Cal.Rptr. 736].)

■ That the first prong of *Duren* was established here is undisputed. Blacks are a cognizable group within the meaning of *Duren*. (*People* v. *Harris, supra,* 36 Cal.3d 36, 51.) Only the adequacy of defendant's showing to meet the second and third prongs is in issue.

■ ■ ■ To satisfy the second prong a defendant must show that the number of members of the cognizable group is not fair and reasonable in relation to the number of members in the relevant community—here Contra Costa County.[12] The evidence established that the normal Monday venire included between six and ten Blacks. Customarily 430 prospective jurors were summoned to appear on a Monday to make up the venire for

---

[12] Because the court accepted total population figures rather than adult, presumptively jury eligible, population figures to establish a prima facie case in *People* v. *Harris, supra,* 36 Cal.3d 36, 55, we do so here. In cases tried hereafter, however, a defendant who has access to census or other demographic data that reflect adult population figures must base his challenge on that data.

The *Harris* court relied in part on a footnote in *Duren* v. *Missouri, supra,* 439 U.S. 357, 365, footnote 23 [58 L.Ed.2d 579, 587], which referred to a comparison of venire makeup with that of the "community." We believe the *Harris* court erred in relying on dictum in that footnote, and in accepting total population figures regardless of the actual availability of more refined data. The actual basis for the *Duren* court's conclusion that underrepresentation of a cognizable class had been established was the showing by the petitioner in that case "that in the relevant community slightly over half of the *adults* are women."

Where a defendant has access to census or other demographic data that reflect the percentage of the relevant group who are *adult* and thus *presumptively jury eligible,* there is no reason why he should not base his jury challenge on that data. (See *Alexander* v. *Louisiana* (1971) 405 U.S. 625, 627 [31 L.Ed.2d 536, 540, 92 S.Ct. 1221]; *People* v. *Alexander* (1985) 163 Cal.App.3d 1189, 1201-1202 [210 Cal.Rptr. 306]; *People* v. *Buford, supra,* 132 Cal.App.3d at p. 291 [evidence introduced that the *eligible adult* Black population in Contra Costa County at the relevant time therein was 7.3 percent.) We observe in this regard that, presently, approximately 32 percent of the Black population of Contra Costa County is under 18 years of age (U.S. Bureau of the Census, Statistical Abstract of the United States (l08th ed. 1988) p. 15)—and thus *not* jury eligible.

If the defendant has made out a prima facie case under the second prong, the People may, of course, introduce evidence to more accurately define the presumptively jury-eligible population—e.g., reliable statistics, or other evidence, which factor out from the general adult population figures those persons who are jury ineligible—noncitizens, ex-felons, etc. By so doing the People may demonstrate a lesser disparity than is suggested by the defendant's showing, and thereby rebut the prima facie case.

the week. Although a larger number was summoned for the week in which defendant's jury was to be selected, the experience with regard to the percentage of Blacks and reasons for deferral was typical of venires over the past six months. Assuming therefore an average number of eight Black prospective jurors among the approximately two hundred forty-five persons placed on a weekly venire,[13] Blacks would constitute slightly over 3 percent of the prospective jurors on Contra Costa County venires at the time of defendant's trial. At that time Blacks comprised approximately 8 percent of the total population of the county. The absolute disparity reflected in these figures was thus 5 percent.

It does not appear that a disparity of this degree renders the representation of Blacks on jury venires less than fair and reasonable in relation to their numbers in the general population of Contra Costa County. However, the Supreme Court has not yet spoken definitively on either the means by which disparity may be measured[14] or the constitutional limit of permissible

---

[13] For the week in which defendant's jury was selected, the venire of eligible prospective jurors after excuses and deferrals was 266 of the 468 persons summoned for jury service—or 57 percent. Since the number of summonses mailed in an average week was slightly less (430 persons), the approximate number of eligible prospective jurors placed on weekly venires was 245 (57 percent of 430).

[14] Several statistical tests have been acknowledged by the Supreme Court, utilized by the lower federal courts and the courts of our sister states, and suggested by legal scholars. (See Kairys et al., *Jury Representativeness: A Mandate for Multiple Source Lists,* (1977) 65 Cal.L.Rev. 776, 789-790.)

The "absolute disparity" test measures representativeness by the difference between the proportion of the population in the underrepresented category, and the proportion of those persons in the source or pool in the underrepresented category. In this case the source is the merged list drawn from voter registration and Department of Motor Vehicle driver's license/identification card holders. In a hypothetical example of absolute disparity suggested in Kairys, *supra,* if 30 percent of the 18-and-over population is Black, but only 20 percent of the source list is Black, the absolute disparity for Blacks is 30 percent minus 20 percent, or 10 percent. (*Id.,* 65 Cal.L.Rev. at pp. 789-790.)

The Supreme Court used an absolute disparity statistical analysis in *Duren.* (439 U.S. at p. 367 [58 L.Ed.2d at p. 588].) Many federal courts have approved the absolute disparity test as the statistical method of choice by which to make out a prima face fair cross-section violation. (See, e.g., *United States* v. *Cecil* (4th Cir. 1988) 836 F.2d 1431; *United States* ex rel. *Barksdale* v. *Blackburn* (5th Cir. 1981) 639 F.2d 1115, 1121-1122.)

Use of more complex tests than the absolute disparity method—e.g., the "statistical significance" test or the "comparative disparity" test—has been criticized as distorting the proportional representation when the group allegedly excluded is very small. (See *United States* v. *Hafen* (1st Cir. 1984) 726 F.2d 21, 24; *United States* v. *Musto* (D.N.J. 1982) 540 F.Supp. 346, 355-356; see also Kairys, *supra,* 65 Cal.L.Rev. at p. 795, fn. 103.) The "statistical significance" test involves a complex mathematical formula involving the assignment of values, subtraction, division, the taking of square roots, and ultimately reference to a "normal distribution table or " 'two-taled' Z Table." (See *People* v. *Buford, supra,* 132 Cal.App.3d at pp. 296-297, fns. 2 and 3.)

Although our review of the cases convinces us that the United States Supreme Court, and many other federal and state courts, have accepted—without embellishment—a test that looks to the difference between the proportion of the cognizable group in the presumptively

disparity.[15] ▮ We need not attempt to resolve these uncertainties here, since we are satisfied that defendant has not made out a prima facie case under the third prong by showing that the disparity is caused by "systematic" exclusion of Blacks.

Defendant did not contend that the master list was underrepresentative and offered no evidence to suggest that it may have been. Instead he focussed only on the weekly venires, but even here offered no evidence identifying the probable cause of the disparity. He speculates now that the allegedly informal manner in which hardship deferrals were granted to prospective jurors was a factor,[16] but he offered no evidence that Blacks sought or were granted deferral on grounds of hardship in greater relative numbers than members of other groups. His claim of "systematic exclusion" is based solely on a statistical showing of consistent underrepresentation. Defendant thus assumes that a prima facie case of "systematic exclusion" of the underrepresented group may be demonstrated by nothing more than an inference that a constitutional defect is inherent in the selection process. Justice Broussard also concludes that a statistical showing of this nature is adequate to meet the defendant's burden under the third prong of *Duren*.

jury-eligible population, and that in the jury venire under scrutiny as a constitutionally permissible means by which to demonstrate statistical disparity under the second prong of the *Duren* test, we have in the past declined to adopt any one statistical methodology to the exclusion of the others. (*People* v. *Harris, supra,* 36 Cal.3d at p. 47, fn. 2.)

[15] The dissenting opinion of Justice Broussard, without discussion or authority, deems a 5 percent disparity "substantial" and thus, presumably, so constitutionally significant as to meet the second prong of *Duren*. It is far from clear, however, that a 5 percent disparity satisfies this element of the defendant's prima facie case under the second prong. We have found no jurisdiction that so holds.

It is difficult to discern from the case law any one threshold of disparity substantial enough to be deemed constitutionally significant under the second prong of the *Duren* test. In *Alexander* v. *Louisiana, supra,* 405 U.S. 625, a case decided prior to *Duren* and differing in that it involved an equal protection challenge to allegedly discriminatory jury selection procedures, the high court indicated it had never "announced mathematical standards for the demonstration of 'systematic' exclusion of blacks" from jury pools. (*Id.* at p. 630 [31 L.Ed.2d at p. 541].) A 14 percent absolute disparity was seemingly found constitutionally significant in that case. (*Alexander* v. *Louisiana, supra,* 405 U.S. at p. 630; compare *Swain* v. *Alabama* (1965) 380 U.S. 202, 208-209 [13 L.Ed.2d 759, 766, 85 S.Ct. 824] [10 percent disparity deemed inadequate]; see *United States* ex rel. *Barksdale* v. *Blackburn, supra,* 639 F.2d at p. 1127 [absolute disparities ranging from 4.5 to 11.49 percent deemed insufficient]; *United States* v. *Maseny* (5th Cir. 1980) 609 F.2d 183, 190 [less than 10 percent disparity held insufficient].)

[16] In *People* v. *Buford, supra,* 132 Cal.App.3d 288, the Court of Appeal, after considering evidence that the disparity existing at the time of this trial was not likely to be random, concluded that the informal procedure by which hardship deferrals were granted might explain the disparity. As we noted in *People* v. *Morales* (1989) 48 Cal.3d 527, 546-547 [257 Cal.Rptr. 64, 770 P.2d 244], however, evidence presented in cases subsequent to *Buford* at a time when written guidelines had been adopted and the procedures reformed reflected no change in the percentage disparity. (See *People* v. *Simmons* (1985) 164 Cal.App.3d 1070, 1072-1073 [211 Cal.Rptr. 60]; *People* v. *Pervoe* (1984) 161 Cal.App.3d 342, 352 [207 Cal.Rptr. 622]; *People* v. *Black* (1984) 160 Cal.App.3d 480, 482-483 [206 Cal.Rptr. 744]; *People* v. *Jones* (1984) 151 Cal.App.3d 1029 [199 Cal.Rptr. 185].)

We disagree. Neither the Supreme Court's acceptance of statistical evidence that the underrepresentation in that case was not a chance occurrence, nor the court's statement that "systematic disproportion itself demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section" (439 U.S. 357, 368, fn. 26 [58 L.Ed.2d 579, 589]), supports the proposition that in a Sixth Amendment representative cross-section challenge statistical evidence that disparity is not a chance occurrence is adequate to meet the defendant's burden in all situations. Were statistical evidence of recurring disparity alone adequate to establish a prima facie violation of the cross-section guaranty, the third prong of the *Duren* test would be surplusage. By including as an element of a prima facie case a demonstration that the disparity is caused by "systematic exclusion" of members of the underrepresented group, the Supreme Court clearly intended to require more.

The context in which the quoted statement and the court's holding in *Duran* were made—that of a state in which the jury selection criteria being applied were not neutral—must be considered in understanding the meaning of "systematic disproportion" as the court used that phrase. The selection criteria which were in use in the State of Missouri when the *Duren* challenge was made permitted members of a cognizable class, women, to claim exemption from jury service. Thus, the defendant in that case met all three prongs of the test: (1) the class was cognizable, (2) it was underrepresented, and (3) a constitutionally impermissible basis for excusing those class members had been identified as the probable cause of the disparity. The statistical evidence tended to show the causal relationship between the disparity and the impermissible feature. The defendant thus made out a prima facie case as to the third prong by showing both of the elements we hold are required. Defendant in the case at bench did neither.

The Supreme Court has noted in a recent decision, albeit in another context, that in positions requiring special qualifications gross statistical disparities have little probative value in establishing a prima facie pattern or practice of discrimination. In such cases it cannot be assumed that " 'that all citizens are fungible for purposes of determining whether members of a particular class have been unlawfully excluded.' " (*City of Richmond* v. *J.A. Croson Co.* (1989) 488 U.S. 469, __ [102 L.Ed.2d 854, 887, 109 S.Ct. 706], quoting from *Mayor* v. *Educational Equality League* (1974) 415 U.S. 605, 620 [39 L.Ed.2d 630, 644, 94 S.Ct. 1323].) This observation would appear to apply with equal force to a jury selection system.

Therefore, even were we to assume arguendo that the Contra Costa County master jury list itself was fairly representative of the adult, presumptively jury eligible, Black population of the county, we could find no

basis in the statistical showing made by defendant, or in the evidence regarding the procedure and criteria for excusal or deferral the jury commissioner testified were in use, to establish a prima facie Sixth Amendment violation through systematic exclusion of Blacks from venires. Unlike the jury selection procedures in *Duren* and *Taylor* v. *Louisiana* (1975) 419 U.S. 522 [42 L.Ed.2d 690, 95 S.Ct. 692], the criteria for deferral or excusal applied in Contra Costa County did not single out any cognizable group. They were, and are, neutral with respect to race, ethnicity, religion, sex, etc. Defendant offered no evidence that those criteria were not applied evenhandedly without regard to race, ethnicity, religion, sex, or economic status.

Nor do we accept the proposition inherent in defendant's claim that constitutionally impermissible "systematic exclusion" could be shown by demonstrating that underrepresentation of a cognizable class is the result of applying neutral criteria to grant deferrals on grounds of hardship. Defendant speculates, for example, that the disparity he proved exists because a large percentage of Black residents of Contra Costa County live in Richmond, have lower than average income, and lack ready transportation to the courthouse in Martinez. They qualified for hardship deferrals on that basis. No case holds, however, that disparity that results notwithstanding application of neutral and presumptively constitutionally permissible jury selection criteria is a product of "systematic exclusion."

■ The high court has not suggested that the state must *create* venires that reflect a representative cross-section of the population. The Sixth Amendment forbids the *exclusion* of members of a cognizable class of jurors, but it does not require that venires created by a neutral selection procedure be supplemented to achieve the goal of selection from a representative cross-section of the population. (*United States* v. *Cecil, supra,* 836 F.2d 1431, 1447-1449.) ■ We do not hold, however, as the dissenting opinion of Justice Broussard suggests, that if neutral procedures and criteria are used in the selection process, the impact of those procedures on the defendant's ability to select a jury from a representative cross-section is never relevant. That question is not before us since defendant failed to identify any criterion used in the jury selection process that was arguably impermissible or was applied in an impermissible manner, and while he speculated that hardship deferrals were involved he neither demonstrated that they caused the disparity nor established that the basis on which they were granted was constitutionally impermissible.

Had defendant demonstrated that a disproportionate number of Blacks were deferred on grounds of hardship, and identified the aspect of the hardship criteria used to defer them, we would be called upon to determine

whether the state has a sufficiently compelling interest in permitting prospective jurors to obtain deferrals on that basis to justify its impact on the composition of the venire. (*Duren* v. *Missouri, supra,* 439 U.S. 357, 367-368 [58 L.Ed.2d 579, 588-589]; *People* v. *Morales, supra,* 48 Cal.3d 527, 548; *People* v. *Harris, supra,* 36 Cal.3d 36, 59.)

In the absence of controlling authority, or compelling reason to conduct hearings and respond to challenges that are based solely on a statistical showing of disparity, however, we are satisfied that the then-existing procedures for jury challenges established by our Legislature (former §§ 1055 et seq.) comport with the teaching of *Duren,* and adequately protect a criminal defendant's right to a jury drawn from a representative cross-section of the population.

As the dissenting opinion of Justice Broussard notes, the jury selection procedures used in Contra Costa County at the time of defendant's trial did not comply in all respects with the statutes then in effect. Defendant did not base his challenge to the venire on any departure from state statutory procedure, however, and does not now argue that any departure from that procedure affected the composition of the jury. He relies only on the assertion that the trial court erred in rejecting his Sixth Amendment based challenge. Because he failed to establish a prima facie case of systematic exclusion of a cognizable class in the jury selection process, the trial court properly denied his challenge.

V

GUILT PHASE ISSUES

A. *Prosecutorial Misconduct.*

1. *Reference to Statement of Informant.*

Defendant identifies as misconduct numerous statements made by the prosecutor in his examination of witnesses and argument to the jury. One such statement was made during the prosecutor's cross-examination of defendant's expert, Dr. Shomer, who had offered his opinion that the eyewitness identification of defendant as the killer was not reliable. An informant had told police that the informant had seen defendant in possession of a small handgun on the day before the crime. The informant's statement was included in a police report, but the parties had stipulated that the informant would not be called. In cross-examination the prosecutor nonetheless asked Dr. Shomer if he had considered the police report in forming his opinion, stating: "And I take it that you considered the report at Page 13, where the

witness said that 'suspect had been observed in possession of a small-barreled gun and was cleaning the weapon the day before the crime.'"

Defendant objected that the prosecutor had violated the stipulation, and on grounds that the statement was hearsay, was irrelevant, and was highly prejudicial. The court sustained the objection and instructed the jury to disregard the statement, which the prosecutor had finished reading without acknowledging the objection.

■■■ The prosecutor's action was clearly misconduct whether or not it violated the stipulation. Dr. Shomer's knowledge of that statement in the police report was not relevant to his opinion regarding the reliability of the identification. An expert may be cross-examined regarding the subject to which his testimony relates, the matter on which he bases his opinion, and the reasons for his opinion. (Evid. Code, § 721, subd. (a).) ■■■ Therefore, a party seeking to attack the credibility of the expert may bring to the attention of the jury material relevant to the issue on which the expert has offered an opinion of which the expert was unaware or which he did not consider. The purpose and permissible scope of impeachment of an expert is to call into question the truthfulness of the witness's testimony. Impeachment is not general rebuttal. (*Kennemur* v. *State of California* (1982) 133 Cal.App.3d 907, 922 [184 Cal.Rptr. 393].)

■■■ Dr. Shomer did not offer an opinion on defendant's guilt. He testified only about the factors that might have influenced the child witnesses, and that he believed, based on those factors, that the identifications were unreliable. Knowledge that an unidentified informant claimed defendant had been in possession of a handgun shortly before the murder was irrelevant to his opinion that the impact of outside influences on the children made their identification unreliable. ■■■ "The deliberate asking of questions calling for inadmissible and prejudicial answers is misconduct." (*People* v. *Fusaro* (1971) 18 Cal.App.3d 877, 886 [96 Cal.Rptr. 368].)

■■■ If the prosecutor was merely trying to show that Dr. Shomer had not read all of the police reports, as the People now argue, he could easily have done so without asking if he had considered the particular part of the reports that included the informant's statement. In fact, as noted above, it was pointless to ask if he had considered any part of the informant's statement about the gun because that knowledge would not bear on the witness's opinion regarding the reliability of the eyewitness testimony. It thus appears that the prosecutor engaged in a deliberate attempt to put inadmissible and prejudicial evidence before the jury, misconduct that was exacerbated when he continued to read from the police report after defense counsel had objected.

 The misconduct was particularly egregious here because the prosecutor put before the jury the hearsay statement of a person who was not available for cross-examination, and that statement suggested that defendant not only possessed a weapon like that believed to have been used by the murderer, but was cleaning it on the eve of the robbery/murder. This, defendant argues, put evidence before the jury without according him his Sixth Amendment rights to confrontation and cross-examination. It follows, he claims, that a federal constitutional right is involved and the reasonable-doubt standard of reversible error declared in *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065], must be applied.

There is some support for defendant's argument in decisions of the United States Supreme Court, but none expressly holds that misconduct of this nature violates the defendant's Sixth Amendment rights. In a case involving even more egregious misconduct a prosecutor, in the guise of refreshing the recollection of the defendant's accomplice, read from a document "said to be a confession" a statement implicating the defendant. The court held that in the circumstances of that case, the "petitioner's inability to cross-examine [the witness] as to the alleged confession plainly denied him the right of cross-examination secured by the Confrontation Clause." (*Douglas* v. *Alabama* (1965) 380 U.S. 415, 419 [13 L.Ed.2d 934, 937, 85 S.Ct. 1074].) The court recognized that the reading, and the witness's refusal to answer, were not technically testimony, but reasoned that in the mind of the jury the reading by the prosecutor might have been the equivalent of testimony.

Again, in *Donnelly* v. *DeChristoforo* (1974) 416 U.S. 637 [40 L.Ed.2d 431, 94 S.Ct. 1868], the court recognized that prosecutorial misconduct that puts evidentiary matters before a jury may deny the right of confrontation and cross-examination, but declined to treat a lesser error as an invasion of a specific constitutional guaranty. The misconduct in issue was argument suggesting that the defendant had already pleaded guilty in order to obtain a lesser sentence. The court emphasized: "[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice,'" and held that the case was not one "in which the State has denied a defendant the benefit of a specific provision of the Bill of Rights. . . . When specific guarantees of the Bill of Rights are involved, this Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them. But here the claim is only that a prosecutor's remark about respondent's expectations at trial by itself so infected the trial with unfairness as to make the resulting conviction a denial of due process." (416 U.S. at pp. 642-643 [40 L.Ed.2d at pp. 436-437].) Rejecting a Sixth Amendment based claim the court said: "Respon-

dent does suggest that the prosecutor's statements may have deprived him of the right to confrontation. See *Pointer* v. *Texas,* 380 U.S. 400 (1965). But this argument is without merit, for the prosecutor simply stated his own opinions and introduced no statements made by persons unavailable for questioning at trial." (*Id.* at p. 643, fn. 15 [40 L.Ed.2d at p. 437]. See also *People* v. *Bolton* (1979) 23 Cal.3d 208 [152 Cal.Rptr. 141, 589 P.2d 396]; *People* v. *Blackington* (1985) 167 Cal.App.3d 1216 [213 Cal.Rptr. 800]; *People* v. *LoCigno* (1961) 193 Cal.App.2d 360 [14 Cal.Rptr. 354].)

Here the prosecutor did put before the jury a statement by a person unavailable for questioning at trial. The statement did not directly implicate defendant in the crimes, however, and there was other, uncontradicted testimony that defendant had obtained a handgun from his father not long before the crimes. In addition, the trial judge promptly admonished the jury that it was to disregard the prosecutor's statement. Assuming therefore that the misconduct asserted here must be treated as a denial of defendant's right of confrontation and cross-examination, and thus as an impermissible infringement of a specific guaranty of the Bill of Rights, reversal is not required. We are satisfied beyond a reasonable doubt that this instance of prosecutorial misconduct alone did not affect the verdict. (*Chapman* v. *California, supra,* 386 U.S. 18, 24.)

We will consider below whether the cumulative impact of the several instances of prosecutorial misconduct was prejudicial (*People* v. *Beivelman* (1968) 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913]; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]), or "so infected the trial with unfairness as to make the resulting conviction a denial of due process." (*Donnelly* v. *DeChristoforo, supra,* 416 U.S. 637, 643 [40 L.Ed.2d 431, 437].) ▮▮▮ "To constitute a due process violation, the prosecutorial misconduct must be ' "of sufficient significance to result in the denial of a defendant's right to a fair trial." ' . . . When the defendant contends that a prosecutor's question rendered his trial fundamentally unfair, it is important 'as an initial matter to place th[e] remar[k] in context.' [Citations.] The sequence of events . . .—a single question, an immediate objection, and two curative instructions[ ]—clearly indicates that the prosecutor's improper question did not violate [defendant's] due process rights." (*Greer* v. *Miller* (1987) 483 U.S. 756, 765-766 [97 L.Ed.2d 618, 630-631, 107 S.Ct. 3102]. See also *Darden* v. *Wainwright* (1986) 477 U.S. 168, 179 [91 L.Ed.2d 144, 156, 106 S.Ct. 2464].)

2. *Other Misconduct.*

In addition to what appears to have been intentional misconduct in reading from the police report the informant' statement, defendant identifies

several other actions by the prosecutor which he characterizes as misconduct. ■■■ We observe initially that defendant failed to object to some of the statements and argument he now claims as prejudicial misconduct. Because " 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect [of misconduct] upon the minds of the jury' " (*People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468]), a defendant will be deemed to have waived the objection if he fails to raise the matter at trial. "[T]he initial question to be decided in all cases in which a defendant complains of prosecutorial misconduct for the first time on appeal is whether a timely objection and admonition would have cured the harm. If it would, the contention must be rejected . . . ; if it would not, the court must then and only then reach the issue whether on the whole record the harm resulted in a miscarriage of justice within the meaning of the Constitution." (*Id.* at p. 34. See also *People* v. *Malone* (1988) 47 Cal.3d 1, 36-37 [252 Cal Rptr. 525, 762 P.2d 1249].)[17] We consider defendant's claims in light of these well settled rules.

■■■ ■■■ a. As additional instances of misconduct, defendant claims that the prosecutor misstated the facts and the law when he argued that Dr. Shomer was not competent to offer an opinion because he had not read all of the police reports; suggested that defense counsel had deliberately failed to discuss parts of the reports with Dr. Shomer; and implied that the prosecutor had additional information that should have been considered.

■■■ The prosecutor stated about Dr. Shomer: "His opinions aren't worth anything. He has no right to make those opinions because he wasn't at the scene and he didn't see [the eyewitnesses] testify, and he hasn't read all the police reports in the case, and he has no right to make those opinions." This assertion was technically misleading since the Evidence Code permits the admission of expert opinion (Evid. Code, §§ 801-805), and Dr. Shomer had been qualified as an expert. There was, however, no objection to this remark.

■■■ After defense counsel had criticized the police during closing argument for failing to make a more thorough investigation into Larry Bell's role in the case, the prosecutor responded: "He goes on at length and

---

[17]The same rule should apply of course, when the defendant asserts the claim as one involving denial of due process. In *Greer* v. *Miller, supra,* 483 U.S. 756, 765 [97 L.Ed.2d 618, 630], the court noted both the objection to the prosecutorial misconduct, and the trial court's admonition to the jury. The court also observed that "trial counsel bore primary responsibility for ensuring that the error was cured in the manner most advantageous to his client. Once it became apparent that the judge was not going to grant a mistrial, it was the duty of counsel to determine what strategy was in his client's best interest." (*Id.* at p. 766, fn. 8 [97 L.Ed.2d at p. 631].)

asks you to suppose or imagine why the officers didn't spend more time investigating Larry. Did he ask Detective Tye, who was on the stand, what efforts were made to investigate Larry? No. Did he go into with Detective Tye the other 30 plus pages of his report concerning the Bell offense, which he didn't have his expert look at deliberately? Because if he did, I could go into it as part of his opinion, couldn't I? bring out some things maybe he didn't hear."[18] The prosecutor also said: "You don't know what was in the arrest and police reports, and you don't know whether efforts were made, because [defense counsel] didn't bring them out." He had earlier referred to the "many, many, many pages of police reports" during his cross-examination of Dr. Shomer, thus again suggesting to the jury that there was additional evidence that the jury had not heard.

It is true, as defendant argues, that the police reports to which the prosecutor referred were not in evidence. However, defendant's criticism of the police investigation invited the remark calling to the attention of the jury the existence of an extensive investigatory report. Nonetheless, in the absence of evidence that any matters in the report, other than those pages read by Dr. Shomer, were relevant to his opinion, it was not proper to suggest to the jury or to ask the jury to infer that defense counsel had "deliberately" withheld information about the offense from Dr. Shomer. The suggestion of the People that the prosecutor's remarks were merely intended to remind the jury that Dr. Shomer was not qualified to render an opinion because he had not read all of the reports is implausible and, as we have noted earlier, was a misstatement of the law.

■■■■ b. Although Dr. Shomer had already been qualified as an expert, the prosecutor suggested to the jury that he should be classified in the category of polygraph operators, hypnotists, and truth serum operators, and attempted to challenge his qualifications by cross-examination suggesting that an appellate court had found the witness's opinion unreliable.[19] There is

---

[18] Defense counsel did not object at the point at which the prosecutor asserted that the witness had not read all of the police reports, but did so when the prosecutor subsequently suggested that he had additional information not before the jury.

The judge admonished the jury that if either attorney went beyond the evidence the jury had heard, the comments were to be disregarded. The judge also admonished counsel to confine their arguments to the record.

[19] In fact, Dr. Shomer's qualifications had not been questioned in the case to which the prosecutor referred, *People* v. *Guzman* (1975) 47 Cal.App.3d 380 [121 Cal.Rptr. 69]. The Court of Appeal simply upheld a decision of the trial court excluding the proffered testimony on grounds that expert testimony regarding the factors involved in identification was not necessary. The Court of Appeal noted the discussion in *Ballard* v. *Superior Court* (1966) 64 Cal.2d 159, 171 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416], and asked rhetorically: "How far should the courts go in allowing so-called scientific testimony, such as that of polygraph operators, hypnotists, 'truth drug' administrants, as well as purveyors of general psychological theories, to substitute for the common sense of the jury? Surely the answer is 'not

no doubt that the prosecutor deliberately committed misconduct here, too, since he deliberately misstated the holding of the Court of Appeal in an attempt to mislead the jury. The impact of this argument may have been diminished, however, by the trial court's comment that there are times when appellate courts should be ignored, and the jury's awareness that Dr. Shomer had been permitted to testify not only in this case but also in many other courtrooms.

 c. The prosecutor implied that defense counsel might believe that defendant was guilty, and also suggested that the defense was free to mislead and/or confuse the jury.

During his rebuttal argument the prosecutor remarked that defense counsel had spent some time on the special circumstances issues, "and for a man who says that his client didn't commit the crime, that must be a waste of time. But, on the other hand, he might be worried that he did commit it." It is improper for a prosecutor to argue to the jury as an analysis of the defense argument or strategy that defense counsel believes his client is guilty. (See *People* v. *Purvis* (1963) 60 Cal.2d 323, 343 [33 Cal.Rptr. 104, 384 P.2d 424].)

The People suggest that the remark was not improper here since the prosecutor was not making a factual statement of defense counsel's belief, but was simply pointing out the "internal disharmony" between the defense theories that the crimes were not premeditated and that the charge against defendant involved mistaken identity. A similar argument was rejected in *Purvis, supra,* 60 Cal.2d 323, and is equally unavailing here. There is no inconsistency in denying that an accused was the perpetrator of an offense while simultaneously arguing that no matter who committed it the crime was not premeditated. We note also that while comment on apparent inconsistencies in argument is permissible, defense counsel's personal belief in his client's guilt or innocence is no more relevant than the

in all cases, or even in the ordinary or usual cases.' The good judgment of the trial judge . . . must control in the absence of a clear abuse of discretion." (47 Cal.App.3d at pp. 385-386.) Although *Guzman* was criticized by this court in *People* v. *McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011], its basic holding that the trial court's exercise of discretion will not be disturbed absent a clear abuse of discretion was reaffirmed. We did note there the distinction between expert testimony such as that of Dr. Shomer, a psychologist, and scientific evidence produced by a machine. (*Id*. at p. 372.)

After asking Dr. Shomer on cross-examination if he would not place himself "in the category of polygraph operators, hypnotists, truth drug administrators, and purveyors of general psychological theories," to which the witness replied "certainly not," the prosecutor asserted that there "is some difference of opinion there." Then in guilt phase argument he suggested that this had been the holding of the Court of Appeal: "Okay, just a couple more comments on Shomer. I can't do any better than the appellate court did when they classified his testimony along with hypnotists, truth drug administrators, purveyors of psychological theories."

belief of the prosecutor. (See *People* v. *Bain* (1971) 5 Cal.3d 839, 848-849 [97 Cal.Rptr. 684, 489 P.2d 564].) Inviting the jury to speculate about such belief is misconduct. Here again, however, there was no objection to the remark. Had there been one an admonition by the court that the views of counsel were irrelevant could have avoided any possible prejudice.

In his closing and rebuttal argument, the prosecutor commented: "It's a very common thing to expect the defense to focus on areas which tend to confuse. That is—and that's all right, because that's [defense counsel's] job. If you're confused and you're sidetracked, then you won't be able to bring in a verdict." He also said: "It's his job to throw sand in your eyes, and he does a good job of it, but bear in mind at all times, and consider what [defense counsel has] said, that it's his job to get his man off. He wants to confuse you."

 Although counsel have broad discretion in discussing the legal and factual merits of a case (*People* v. *Beivelman, supra,* 70 Cal.2d 60), it is improper to misstate the law. (*People* v. *Pike* (1962) 58 Cal.2d 70, 97 [22 Cal.Rptr. 664, 372 P.2d 656]) or to resort to personal attacks on the integrity of opposing counsel (*People* v. *Perry* (1972) 7 Cal.3d 756, 789-790) [103 Cal.Rptr. 161, 499 P.2d 129]. Here the prosecutor acknowledged that defense counsel's comments were proper and that he was just doing his job. His remarks could be understood as a reminder to the jury that it should not be distracted from the relevant evidence and inferences that might properly and logically be drawn therefrom. Nonetheless, to the extent that the remarks might be understood to suggest that counsel was obligated or permitted to present a defense dishonestly, the argument was improper. (See former Rules Prof. Conduct, rule 7-105 [a member of the State Bar "shall not seek to mislead the . . . jury by an artifice or false statement of fact or law.").

Had counsel believed the jury might misunderstand the prosecutor's meaning, however, an objection should have been made, and the misleading aspect of the argument regarding counsel's responsibility could have been cured by admonition. No objection was made.

 d. In closing argument, pursuing the defense theory that Larry Bell was the perpetrator of the crimes, defendant's counsel commented that the senseless nature of the killings might be accounted for by Larry's use of cocaine. In rebuttal the prosecutor stated: "Those of you who have some medical knowledge know that cocaine is a downer, you get mellow on it. It's not like methedrine which stokes you up and causes you to do irrational acts. Cocaine is a downer. You don't go out and shoot people on cocaine. You make love; you're mellow."

The remarks appear to have been factually inaccurate[20] and were improper since they were neither based on the evidence nor related to a matter of common knowledge. The prosecutor's inaccurate and misleading remarks went far beyond the speculative suggestion of defense counsel regarding the possible effect of cocaine on Larry Bell since the prosecutor purported to be stating a scientific fact. Even if defense counsel's remarks were improper based on the state of the evidence, they did not justify the prosecutor's response. (See *People* v. *Perry, supra,* 7 Cal.3d at p. 789.)

Again, however, defendant did not object to the prosecutor's remarks. The impropriety was one that could have been offset by an instruction or admonition by the court, and thus the claim is one that must be deemed waived by the failure to object.

 Finally, we reject defendant's claim that the prosecutor's comment on defendant's failure to call Larry Bell at trial was misconduct. Comment on the failure to call a logical witness is proper. (*People* v. *Ford* (1988) 45 Cal.3d 431, 449 [247 Cal.Rptr. 121, 754 P.2d 168, A.L.R.4th 1507]; *People* v. *Szeto* (1981) 29 Cal.3d 20, 34 [171 Cal.Rptr. 652, 623 P.2d 213]; *People* v. *Vargas* (1973) 9 Cal.3d 470, 475 [108 Cal.Rptr. 15, 509 P.2d 959].)

3. *Prejudicial Impact of Misconduct.*

 In none of the instances of misconduct to which defendant failed to object was the misconduct so egregious that a timely admonition

---

[20]The People acknowledge that the remarks were incomplete, but claim they were not "substantially inaccurate." However, in summarizing the testimony of numerous experts in *People* v. *Davis* (1979) 92 Cal.App.3d 250, 255 [154 Cal.Rptr. 817], the Court of Appeal noted their agreement that "cocaine is not a narcotic. Narcotics . . . are depressant drugs . . . [¶] Appellants' experts . . . testified that as a stimulant, cocaine increases brain activity, blood pressure, and body temperature, causing sleeplessness, euphoria and reduced appetite. . . . [A]mong cocaine's acute effects [are] lessened fatigue, improved attentiveness and alertness, enhanced speed of learning, and increased motor activity and speed with which complex tasks might be performed." Respondent's experts in *Davis* had testified that chronic cocaine use can lead to "antisocial behavior, hallucination, and paranoia." (*Id*. at p. 257.)

For a similar description of the effect of cocaine, see: American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (3d ed. rev. 1987) pages 145-146: "The maladaptive behavior effects may include fighting, . . . impaired judgment, and interference with social or occupational functioning . . . . Intoxication with high doses of cocaine may be associated with . . . paranoid ideation. . . . Curiosity and bizarre behavior . . . may be observed."

Thus, contrary to the assertions of the prosecutor in his argument, and the People's claim that those remarks were not substantially inaccurate, cocaine is not a depressant. It may not be a "downer" that "mellows" the user. Nor was the evidence that Larry Bell had been shooting cocaine at the time of the offense inconsistent with the idea that he might have shot the victims.

would not have cured its impact. We consider then only the misconduct to which objection was made in assessing whether notwithstanding the admonitions given the impact was such that reversal is required. (*People* v. *Green, supra,* 27 Cal.3d 1, 34.) That misconduct included:

a. Improper cross-examination of Dr. Shomer, suggesting that an appellate court had found him unqualified to testify as an expert, and had analogized his expertise to that of polygraph examiners and persons who administer truth serum. The trial court did not admonish the jury that the Court of Appeal holding was irrelevant, or that the prosecutor had misstated the holding, but said only: "I hesitate to say that I should ignore Appellate Courts, but sometimes we do."

b. Reading the informant's statement that defendant had been cleaning a small handgun the night before the Wolff's Jewelry Store robbery and shooting. When the jury returned to the courtroom after counsel had argued the defense motion for mistrial and objection to the cross-examination, the court announced that the jury would be permitted to go to lunch, explaining that other matters were engaging the court's attention, and then said: "The comments read by Mr. Yancey have been stricken by the Court from the record, and the jury is admonished to disregard those in all respects with the same force and effect as if you had never heard them, and they are not to be considered by you for any purpose whatsoever."

c. Advising the jury that there was a 30-page police report which defense counsel deliberately did not have read by Dr. Shomer, and which contained information that the prosecutor could otherwise have brought out. The court admonished the jury that comments by either attorney that exceeded the bounds of the evidence were to be disregarded.

While we do not condone the conduct of the prosecutor, we are satisfied that the trial court's admonitions and instructions were sufficient to offset any impact that conduct might otherwise have had on the verdicts. The voir dire of Dr. Shomer regarding his qualifications took place in the presence of the jury which was therefore aware that regardless of what may have occurred in the *Guzman* case, he had been found qualified to testify in this case. This knowledge, reinforced by subsequent instructions regarding the manner in which an expert's opinion should be treated by the jury, made it clear to the jury that Dr. Shomer had been found qualified to offer expert opinion, and the prosecutor's argument should be understood

as going only to the weight that the prosecutor believed should be given to that opinion.[21]

■■ ■■ The instructions given prior to deliberation also reinforced the court's admonition that argument by counsel regarding matters that were not in evidence must be disregarded. The jury was instructed that it "must not consider as evidence any statement of counsel made during the trial," that it "must never speculate to be true any insinuation suggested by a question asked a witness," and that matter that had been stricken was "to be treated as though you had never heard of it." It is extremely unlikely therefore that the jury disregarded both the court's admonition and its instructions, and speculated that there was additional evidence of defendant's guilt in the police report or that Dr. Shomer's opinion had been formed without access to relevant evidence.

In addition, the improper cross-examination was directed only to whether Dr. Shomer was qualified to offer an opinion. It did not call into question the accuracy of any of the factors on which his opinion was based. Those factors, which included the possible bias of the witnesses arising out of knowledge that defendant had killed Dorothy's father, were explained to the jury which could itself evaluate the weight to be given to the opinion based on those matters.

The most troubling instance of misconduct is the reading of the informant's statement that defendant had cleaned a small handgun on the night before the robbery. The trial court had instructed the jury that it was not to consider the statement, however, and as noted earlier, defendant's father had testified that defendant took such a gun from him not long before the robbery.

We recognize that the jury had been unable to reach a verdict on the robbery, murder, and attempted murder counts in the prior trial, and the

---

[21] Overruling the prosecutor's objection to admission of the expert testimony, the court had ruled that while "there are some obvious areas that [the prosecutor had] developed, that I'm sure the jury will take into account, . . . based on the witness' background, training and experience, it would seem to me he is qualified to offer an opinion. Any weaknesses that there may be in the opinion process go to the weight to be accorded that opinion rather than the admissibility, . . . ."

The jury was instructed prior to retiring to deliberate that: " A person is qualified to testify as an expert if he has special knowledge,skill, experience, training or education sufficient to qualify him as an expert on the subject to which his testimony relates. [¶] Duly qualified experts may give their opinions on questions in controversy at a trial. To assist you in deciding such questions, you may consider the opinion with the reasons given for it, if any, by the expert who gives the opinion. You may also consider the qualifications and credibility of the expert. [⸿] You are not bound to accept an expert opinion as conclusive, but should give to it the weight to which you find it to be entitled. You may disregard any such opinion if you find it to be unreasonable."

jury in the instant trial at one point found itself deadlocked. We conclude nonetheless that it is not reasonably probable that a more favorable verdict would have been reached absent the misconduct of the prosecutor, and that this misconduct did not render defendant's trial fundamentally unfair so as to deny him due process of law. We reach the same conclusion in considering the cumulative effect of both these instances of misconduct to which objection was made, and those as to which there was no objection. Defendant was identified as the perpetrator of these crimes by two direct witnesses as well as a third witness whose testimony afforded additional circumstantial evidence that it was he who had entered the jewelry store and shot the victims. Two of these witnesses had known both defendant and Larry Bell for several years and had no hesitancy in distinguishing the brothers. The third had known Larry Bell and was certain that the person in the jewelry store had been defendant, not Larry.

### B. *Judicial Misconduct.*

Defendant also contends he was denied a fair trial because the judge failed to intervene sua sponte to curb the misconduct of the prosecutor during closing arguments. While it is the duty of the judge to "control all proceedings during the trial, and to limit . . . the argument of counsel to relevant and material matters" (§ 1044), we do not expect the judge to correct each instance of misconduct on his own motion. (*People v. Adcox* (1988) 47 Cal.3d 207, 261 [253 Cal.Rptr. 55, 763 P.2d 906]; *People v. Poggi* (1988) 45 Cal.3d 306, 335-336 [246 Cal.Rptr. 886, 753 P.2d 1082].) Counsel are allowed considerable discretion in presenting and arguing their case, just as opposing counsel are permitted to determine in the first instance whether and when to object to any perceived abuse of that discretion. In this setting the role of the judge is somewhat restricted, although he must be more than a bystander or umpire and has a duty to assure a fair trial, he is not required to identify as misconduct, or correct sua sponte, improper prosecutorial argument. Moreover, because we have determined that the cumulative effect of the prosecutor's errors in this case was not prejudicial, reversal because of the failure of the judge to have prevented or corrected those same errors sua sponte is not warranted.

### C. *Conviction of Violation of Section 12021.*

Defendant was charged with violating section 12021, which prohibits any person who has been convicted of a felony from owning or possessing a concealable firearm. It was alleged that on the day defendant committed the principal crimes in this case he was in possession of a pistol, and that he had previously been convicted of the felonies of manslaughter and theft. At trial the prosecution produced documentary proof that 10 years earlier defend-

ant had been convicted of manslaughter and committed to the Youth Authority.[22] Defendant put on no defense to the charge of violating section 12021 and was duly convicted of it, but sentence thereon was permanently stayed. In his brief on appeal defendant contended for the first time that as a matter of law he could not be convicted under section 12021 because he had been honorably discharged from the Youth Authority on the manslaughter commitment in 1972. After investigation, the Attorney General stipulated that defendant had indeed been honorably discharged from his Youth Authority commitment, and that this court may take judicial notice of that fact.

Defendant relies on Welfare and Institutions Code section 1772, subdivision (a), which provides in relevant part that every person honorably discharged by the Youth Authority "shall thereafter be released from all penalties and disabilities resulting from the offense or crime for which he or she was committed . . . including, but not limited to, any disqualification for any employment or occupational license, or both, created by any other provision of law."

■■■■ Whether the prohibition of section 12021 against carrying a concealable firearm is a "penalty" or "disability" within the meaning of Welfare and Institutions Code section 1772 is a question of first impression. There appear to be only two reported cases in which the latter terms have been construed. In *People* v. *Navarro* (1972) 7 Cal.3d 248 [102 Cal.Rptr. 137, 497 P.2d 481], the trial court ruled the defendant ineligible for the narcotic addicts rehabilitation program (Welf. & Inst. Code, § 3000 et seq.) because he had previously been convicted of assault with a deadly weapon and committed to the Youth Authority; Welfare and Institutions Code section 3052 (hereafter section 3052) barred from the addict rehabilitation program persons convicted, inter alia, of assault with a deadly weapon. This court held defendant eligible for the program because assault with a deadly weapon is punishable either as a felony or as a misdemeanor, and commitment to the Youth Authority for such an offense ipso facto reduces it to a misdemeanor for all purposes, thus avoiding the bar of section 3052. (*People* v. *Navarro, supra,* at pp. 266-271.)

Although that holding was dispositive of the appeal, we addressed the defendant's alternate contention that his honorable discharge from the Youth Authority also relieved him of the bar of section 3052. We proceeded by analyzing the policies underlying the two statutes. The Youth Authority Act, we reasoned, was intended to protect the public by subjecting youthful

---

[22]This crime was apparently defendant's fatal shooting of Alcus Dorton, father of one of the eyewitnesses herein.

offenders to rehabilitation rather than retributive punishment; such rehabilitation is achieved by a variety of programs, including education, vocational training, work furloughs, supervised parole, and ultimately honorable discharge and expungement of criminal record. Similarly, the purpose of the narcotic addict commitment program is to protect the public by substituting the rehabilitation of addicts for their punishment, and the goal is also achieved by such methods as training, supervised parole, and discharge with expungement. We concluded that in the case of the youthful narcotic addict, commitment to the addict rehabilitation program would promote the purposes of the Youth Authority law, and hence that the bar to such commitment presented by section 3052 should be deemed one of the penalties and disabilities released by honorable discharge from the Youth Authority. (*People* v. *Navarro, supra,* 7 Cal.3d at pp. 280-281.)

The second case to construe Welfare and Institutions Code section 1772 was *People* v. *Jackson* (1986) 177 Cal.App.3d 708 [222 Cal.Rptr. 470]. There the defendant was impeached by two prior felony convictions for which he had been committed to the Youth Authority and honorably discharged. Again the court looked to the policies involved, reasoning that the rehabilitative purposes of the Youth Authority Act would to some extent be frustrated if a youthful offender were dissuaded from testifying in his own behalf because of the lingering taint of an offense for which he had been honorably discharged from the Youth Authority. (*Id.* at pp. 711-712.)

We undertake a similar analysis here. "Penal Code, section 12021, is part of the legislative scheme originally promulgated in 1917 (Stats. 1917, ch. 145, p. 221, § 1) and commonly known as the Dangerous Weapons Control Act. . . . ▉ The clear intent of the Legislature in adopting the weapons control act was to limit as far as possible the use of instruments commonly associated with criminal activity [citation] and, specifically, 'to minimize the danger to public safety arising from the free access to firearms that can be used for crimes of violence.' (*People* v. *Scott,* 24 Cal.2d 774, 782 [151 P.2d 517].)" (*People* v. *Washington* (1965) 237 Cal.App.2d 59, 66 [46 Cal.Rptr. 545].) The law presumes the danger is greater when the person possessing the concealable firearm has previously been convicted of felony, and the presumption is not impermissible. (*People* v. *Dubose* (1974) 42 Cal.App.3d 847, 849-850 [117 Cal.Rptr. 235].) ▉ It is evident that "the almost frivolous 'burden' suffered by a convicted felon denied the 'right' to carry a concealable weapon" (*id.* at p. 850) pales in comparison with the true disability suffered, for example, by the narcotic addict in *Navarro, supra,* 7 Cal.3d 248, who was denied the opportunity for treatment in the addict rehabilitation program. More important, while that treatment is consistent with and supportive of the remedial purposes of the Youth Authority law, *the same could not be said of a decision to permit youthful*

ex-felons to carry concealed firearms. We conclude that the prohibition of section 12021 is not one of the penalties or disabilities released by honorable discharge from the Youth Authority, and hence that defendant's conviction of violating that statute is valid.

We find support for our conclusion in the legislation governing the pardon of adult ex-felons. (§ 4852.01 et seq.) After release from prison, successful completion of parole, and a lengthy additional period of rehabilitation in this state during which the ex-felon must "live an honest and upright life," "conduct himself with sobriety and industry," and "exhibit a good moral character" (§ 4852.05), he may petition the superior court for a certificate of rehabilitation (§ 4852.07). If, after investigation by law enforcement authorities and a thorough hearing into the matter, the court finds that the petitioner has demonstrated "his rehabilitation and his fitness to exercise all of the civil and political rights of citizenship," it will issue a certificate of rehabilitation recommending that the Governor grant a full pardon. (§ 4852.13.) But even though such a pardon entitles the ex-felon thereafter to exercise all civil and political rights and privileges, specifically including the right to own or possess any lawful firearm (§ 4852.17), the legislation expressly declares that "this right shall not be restored, and Sections 12001 and 12021 of the Penal Code shall apply, if the person was ever convicted of a felony involving the use of a dangerous weapon." (*Ibid.*; see also § 4852 [pardon of prison inmates].)

In short, the Legislature has determined that any adult convicted of a dangerous-weapon felony should be forever subject to the bar of section 12021, regardless of how complete his rehabilitation. Even the Governor, vested with the pardoning power by the Constitution (art. V, § 8), cannot restore such person's privilege to carry a concealable firearm. The implications for the case at bar are clear: because the prerequisites for an honorable discharge from the Youth Authority—i.e., "a good record on parole" (Welf. & Inst. Code, § 1772)—are much less stringent than the requirements for obtaining a full gubernatorial pardon, we cannot believe the Legislature intends such a discharge to grant a benefit that it expressly denies to a pardon.

We are aware that the same reasoning was rejected in a different but related context in *People* v. *Taylor* (1960) 178 Cal.App.2d 472, 479-480 [3 Cal.Rptr. 186]. That case dealt with section 1203.4, which provides that an adult defendant who successfully fulfills the conditions of his probation may petition the superior court for dismissal of the charge of which he was convicted, and that the dismissal will release him from "all penalties and disabilities" resulting from the conviction. In *Taylor* the Court of Appeal held that the penalties and disabilities released by section 1203.4 included

the bar of section 12021 against carrying a concealable firearm. We are not persuaded by the court's attempt to distinguish the above-discussed statutes limiting the pardoning power, but we need not formally disapprove it: in the very next session after *Taylor* was decided, the Legislature settled the matter by amending section 1203.4 to specifically declare that dismissal of a charge after completion of probation does *not* permit the person to own or possess a concealable firearm, or prevent his conviction under section 12021.[23]

### D. *Ineffective Assistance of Counsel.*

■■■■ Defendant contends he was denied the effective assistance of counsel during the guilt phase because his counsel failed to object to several instances of prosecutorial misconduct.

■■■■ To make a successful claim of ineffective assistance of counsel, the defendant must show that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's deficient representation subjected the defense to prejudice, i.e., there is a reasonable probability that but for counsel's failings the result would have been more favorable. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 698, 104 S.Ct. 2052]; *People* v. *Williams* (1988) 44 Cal.3d 883, 937 [245 Cal.Rptr. 336, 751 P.2d 395]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 217-218 [233 Cal.Rptr. 404, 729 P.2d 839].) ■■■■ Defendant does not carry his burden of proving that trial counsel's failure to object to the prosecutor's misconduct amounted to deficient performance. As we explained in *People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]: "In some cases . . . the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged. In such circumstances, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal." This is such a case: the appellate record sheds no light on why trial counsel acted as he did; he was not asked to explain his performance; although we may doubt that a satisfactory explanation could be provided, we are unable to conclude that it could not. ■■■■■■■■ Thus, we must reject defendant's point.[24]

---

[23] We are also unpersuaded by a 1958 opinion of the Attorney General which concluded that a person honorably discharged from the Youth Authority is not subject, inter alia, to section 12021 simply because section 1203.4 and Welfare and Institutions Code section 1772 "are essentially identical." (32 Ops.Cal.Atty.Gen. 43, 46.) Accordingly, we decline to accept the People's concession of error on this issue.

[24] Defendant also claims that trial counsel's failure to keep from the jury evidence of his prior manslaughter conviction amounted to ineffective assistance. We are not persuaded. Knowledge that defendant had killed Dorothy Dorton's father was important in cross-exami-

 We have determined above that the prosecutor committed several acts of misconduct to which defense counsel failed to object. The record, however, does not reveal whether the omissions were part of a legitimate trial strategy or were, as defendant implies, inexcusable oversights. Under *Pope* we must therefore reject defendant's contention. (23 Cal.3d 412, 425-426.)

## VI

### PENALTY PHASE ISSUES

A. *Prosecutorial Misconduct.*

1. *Application of People v. Green in the Penalty Phase.*

Defendant assigns as prejudicial misconduct various remarks by the prosecutor during penalty phase arguments. He failed to object to any of these remarks, however, and hence under *People* v. *Green, supra,* 27 Cal.3d 1, 34, is deemed to have waived the right to complain of them on appeal unless the harm they caused could not have been corrected by appropriate instructions.

Defendant seeks to circumvent *Green* by claiming that it does not apply in the penalty phase of a capital trial. He cites no authority in support, but simply makes the following argument: first, the acts of misconduct in *Green* all occurred during the guilt phase, and second, the purpose of applying the rule of *Green* to guilt phase errors would not be served by applying it to penalty phase errors.

The argument is unpersuasive. The rationale for requiring timely objections at trial to alleged acts of misconduct applies equally to the penalty phase. The trial court should be given an opportunity to correct the abuse and prevent by suitable instructions any harmful effect of the misconduct. (27 Cal.3d at p. 27.) There is nothing in the language of *Green* that suggests we intended to limit our holding in the manner defendant urges. *Green* applies in any phase of the trial. (See *People* v. *Adcox, supra,* 47 Cal.3d 207, 258; *People* v. *Moore* (1988) 47 Cal.3d 63, 92 [252 Cal.Rptr. 494, 762 P.2d 1218]; *People* v. *Dyer* (1988) 45 Cal.3d 26, 82 [246 Cal.Rptr. 209, 753 P.2d 1].)

---

nation of the eyewitness and as a factor in Dr. Shomer's opinion regarding the accuracy of the eyewitness identification, since it suggested that all might be biased. Even if we can conclude that counsel's performance was deficient, we simply cannot conclude that such deficient performance subjected the defense to prejudice: there is not a reasonable probability that the result would have been more favorable if counsel had kept the conviction from the jury.

Defendant next argues that instances of "substantial misconduct" by the prosecutor during the penalty phase "automatically fall within the exception to the *Green* rule because no court can state with any assurance that appropriate instructions or admonitions would have cured the harm resulting from the misconduct." Although defendant is correct in pointing out the inherent difficulty in deciding whether misconduct in the penalty phase could have been cured at trial, we need not adopt the inflexible rule he proposes. The fact that an error is "substantial" does not establish that its harmful effects could not have been cured in timely fashion. For example, a prosecutor may commit substantial error by misstating the law to the jury, but the harm may easily be corrected by the court. What it does mean is that a reviewing court must exercise caution in determining whether the effects of misconduct were curable by instruction or admonition.

### 2. *Lack of Remorse.*

In his argument to the jury the prosecutor made such comments as, "I might add that nowhere during the course of this case has there been one scintilla of evidence of remorse for the events in question, neither in the guilt phase or penalty phase. Nothing." Defendant did not object to these remarks.

He first contends the comments constitute error under *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229], and *People* v. *Coleman* (1969) 71 Cal.2d 1159 [80 Cal.Rptr. 920, 459 P.2d 248]. *Griffin* holds that the prosecution may not comment on a defendant's failure to testify on his own behalf. Similarly, under *Coleman* the prosecution may not suggest that "a defendant's failure to confess his guilt after he has been found guilty demonstrates his lack of remorse and that therefore such failure should be considered as a ground for imposing the death penalty." (*Id.* at p. 1168.) Here, however, the prosecutor's remarks did not amount to a comment on defendant's failure to testify or his failure to confess. Rather, they merely constituted a statement to the effect that remorse—a nonstatutory factor in mitigation (*People* v. *Ghent* (1987) 43 Cal.3d 739, 771 [239 Cal.Rptr. 82, 739 P.2d 1250])—was absent. Because remorse is not a statutory factor, comment on its absence is irrelevant and inappropriate in cases in which the defendant has not acknowledged responsibility for the killing or otherwise invited the comment. (See *People* v. *Thompson* (1988) 45 Cal.3d 86, 124 [246 Cal.Rptr. 245, 753 P.2d 37].) Here, however, there was no objection. Had there been one an admonition could have pointed out to the jury the irrelevance of the argument.

### 3. *Predictions of Future Violence.*

In his closing argument the prosecutor suggested to the jury that to sentence defendant to life imprisonment without possibility of parole would

not effectively remove him from "society." Instead, he said, defendant would be placed in a "narrower" society, but one in which there would be other human beings—such as guards, clerics, and fellow prisoners—whom defendant might harm in the future. The prosecutor then asked the jury to consider defendant's potential for committing future violent acts before determining his penalty. Again, defendant assigns error to these remarks for the first time on appeal.

Defendant relies primarily on *People* v. *Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446]. In *Murtishaw,* we held that *expert* forecasts of future violence were of limited probative value and were highly prejudicial. We stated: "One can imagine few matters more prejudicial at the penalty trial than testimony from an established and credentialed expert that defendant, if sentenced to life without possibility of parole, would be likely to kill again." *(Id.* at p. 773.) ▮▮▮ Defendant argues that comments on future dangerousness by the prosecutor, like testimony by an expert witness, should not be allowed. Because the comments of the prosecutor, who can claim neither to be a neutral party nor an expert in predicting human behavior do not have the same potential for prejudice, *Murtishaw* is not controlling. Comment on future dangerousness is permissible if based on the evidence or inferences to be drawn from that evidence. *(People* v. *Adcox, supra,* 47 Cal.3d 207, 258-259; *People* v. *Dyer, supra,* 45 Cal.3d at p. 81; *People* v. *Miranda* (1988) 44 Cal.3d 57, 111 [241 Cal.Rptr. 594, 744 P.2d 1127].) Finally, the prosecutor here did not actually predict that defendant would commit future acts of violence, but merely asked the jury to consider his potential for committing such acts in making the penalty decision.

Defendant also relies on *People* v. *Love* (1961) 56 Cal.2d 720, 731 [16 Cal.Rptr. 777, 366 P.2d 33], in which the court held it was misconduct for the prosecutor to claim that capital punishment has a stronger deterrent effect on crime than imprisonment. *Love,* however, dealt with comments about the general deterrent effect of capital punishment, which is clearly an improper basis on which to impose the death penalty on a particular individual. Here, the prosecutor's comments related only to the obvious fact that the death penalty would prevent the defendant in this particular case from committing future acts of violence. Comments of this type do not violate *Love. (People* v. *Varnum* (1969) 70 Cal.2d 480, 487-488 [75 Cal.Rptr. 161, 450 P.2d 553]; see also *People* v. *Talbot, supra,* 64 Cal.2d 691, 712.) As in *Dyer, supra,* 45 Cal.3d 26, the prosecutor's comments on

future violence in this case were not improper.[25] (See also *People* v. *Thompson, supra,* 45 Cal.3d at pp. 124-125.)

B. *Instructions Regarding Defendant's Mental Condition.*

Dr. Drake, a neurologist, testified on defendant's behalf at the penalty phase. He reported defendant had a cerebral disorder that impaired his ability to think abstractly and to foresee the consequences of his acts. He also testified that defendant had a damaged blood vessel above his ear that produced a constant and disturbing noise. It was the witness's expert opinion that defendant's neurological problems may have resulted from two childhood head injuries and that these problems were likely to be permanent.

The court instructed the jury that in determining the penalty it should consider, if relevant, "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was *impaired as a result of mental disease* or the effects of intoxication." (Italics added.) (Former § 190.3, factor (g).) ■■■ Defendant contends that his condition is a "mental defect" rather than a "mental disease," and that by failing to instruct the jury that it could consider evidence of "mental defect" as well as "mental disease" the court withdrew from its consideration the mitigating evidence of Dr. Drake.

The point is unconvincing. Although such an instruction should be given when warranted by the evidence and requested by a party (see *People* v. *Robertson* (1982) 33 Cal.3d 21, 60 [188 Cal.Rptr. 77, 655 P.2d 279] [plur. opn.]), no prejudicial error appears on the record of this case. To begin with, the instruction given here was entirely correct insofar as it allowed the jury to consider the effect of "mental disease" on defendant's mental capacity. It was taken directly from the language of the 1977 law, and there is no claim that its reference to "mental disease" was improper or misleading. If defendant believed that the instruction was incomplete or needed elaboration, it was his responsibility to request an additional or clarifying instruction. (E.g., *People* v. *Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366].) No such request was made.

More important, it is clear from the record that the instruction given did not in fact withdraw Dr. Drake's testimony from the jury's consideration.

---

[25] Defendant also claims he was denied effective assistance of counsel because his attorney failed to object to the foregoing instances of alleged prosecutorial misconduct in the penalty phase. Because we find no such misconduct, the claim is without merit. For the same reason there is no merit in defendant's additional point that the trial court should have acted on its own motion to "curb" the alleged misconduct of the prosecutor.

First, Dr. Drake himself never referred to defendant's condition as a "mental defect," but testified in more specific terms that defendant's head injuries may have caused a certain "pathology" in his brain resulting in various physical and behavioral "abnormalities." Second, the prosecutor never argued that defendant's mental condition should be disregarded because it is a "defect" rather than a "disease." On the contrary, he stated the issue as being whether defendant had "organic brain damage" that "would make it impossible for him to act as a normal human being." He then challenged Dr. Drake's testimony not as irrelevant but as insufficient, seeking to undermine it on such common grounds as lack of foundation and inconsistency. In turn, defense counsel relied heavily on Dr. Drake's testimony in arguing for mercy because of "the organic brain damage that has seriously affected Ronnie's judgment." Finally, the jury was also instructed that in fixing the penalty it should weigh all the evidence introduced in the trial, and in particular should consider whether defendant acted while "under the influence of extreme mental or emotional disturbance" and any other circumstance that "extenuates the gravity of the crime." It is inconceivable that any reasonable juror, having heard such testimony, argument, and instructions, could have believed that he was somehow barred from considering defendant's mental condition, as described by Dr. Drake, in deciding the issue of penalty.

### C. *Reference to Mitigating Factors Not Shown by the Evidence.*

Former CALJIC No. 8.88.1 enumerates 10 factors in aggravation and mitigation to be considered by the jury "if applicable" in making the penalty decision. ▮▮▮▮ Defendant contends the court erred by reading this list of factors in its entirety, instead of deleting four mitigating factors that were not shown by the evidence in this case.

The contention is unpersuasive. First, the instruction clearly states that the jury is to consider only such factors as are applicable to the case. Second, each mitigating factor is relevant to the jury's consideration in the sense that the Legislature has identified it as a proper subject of consideration in the selection of an appropriate penalty. Thus, by hearing in its entirety the list of mitigating factors the jury receives not merely a collection of circumstances that may or may not be applicable to the case, but is also helped to recognize and evaluate other mitigating factors relevant to the sentencing decision. (*People* v. *Williams, supra,* 44 Cal.3d 883, 959-960.)

Defendant complains, however, that the reading of the entire list of factors allowed the prosecutor to discuss each factor that was *not* applicable to this case and to present the absence of such mitigating factor as an aggravating factor. Although we held that such an argument would be

improper in *People* v. *Davenport* (1986) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861], the prosecutor did not make that contention in the case at bar. Instead, he merely reviewed the mitigating factors on the list and attempted to show that each was either lacking or unimportant. He never expressly characterized the absence of a mitigating factor as a factor in aggravation, and it is unlikely the jury would have interpreted his brief comments about the inapplicable mitigating factors in that manner. Thus, there was no error in the reading of former CALJIC No. 8.88.1 or in the prosecutor's comments on the mitigating factors included in that instruction.

### D. *The Court's Response to a Jury Inquiry.*

After less than two hours of deliberation the jury presented the court with a note asking (1) whether the penalty verdict must be unanimous and (2) whether, "if we disagree on the death penalty, do we automatically go to life imprisonment?" The court replied by instructing the jury that (1) either verdict—death or life imprisonment without possibility of parole—must be unanimous, and (2) if the jurors are unable to reach a unanimous verdict, they must so inform the court. The foreman asked, "What happens then?" and the court answered, "That would not be of any concern to the jury. That would be of concern to the court." The court went on to explain that "If the jury is unable to reach a verdict and you have exhausted the opportunities of discussion and you feel that further discussion would no longer be beneficial to the jury, and that you have been unable to reach a verdict, then let me know that." On ascertaining that the jury wished to continue deliberating, the court allowed it to do so. The next day the jury returned a verdict of death.

The legislation in effect at the time of this trial (former § 190.4, subd. (b)) provided that if a jury was unable to agree on penalty the court would impose a sentence of life without parole.[26] ▮▮▮▮ Defendant contends the court should have told the jury of this statutory provision, and that its failure to do so created a risk of arbitrary decisionmaking by injecting "extraneous and irrelevant considerations" into the deliberations. But the "considerations" defendant has in mind are pure conjecture: he speculates that the jurors might have believed that if they could not reach a verdict, either the penalty phase (or perhaps the entire case) would have to be retried, or the court would impose a sentence of life *with* possibility of parole. The point is unconvincing. The instruction given—that a penalty

---

[26] Today the law is different. Under the 1978 death penalty initiative, if the jury is unable to agree on penalty the court must impanel a new jury; if the second jury is also deadlocked, the court has discretion to impanel a third jury or to impose a sentence of life imprisonment without possibility of parole. (§ 190.4, subd. (b).)

verdict must be unanimous—correctly stated the law, and defendant did not complain when the court refused to educate the jury on the legal consequences of a possible deadlock. That refusal was not error. (*People* v. *Belmontes* (1988) 45 Cal.3d 744, 813-815 [248 Cal.Rptr. 126, 755 P.2d 310]; *People* v. *Kimble* (1988) 44 Cal.3d 480, 511-516 [244 Cal.Rptr. 148, 749 P.2d 803].)

E. *Burden of Proof.*

Defendant contends the due process and cruel and/or unusual punishment clauses of the federal and state Constitutions require that a capital jury be instructed that it must find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors and death is the appropriate penalty. We have rejected this contention under both the 1977 death penalty legislation (*People* v. *Williams, supra,* 44 Cal.3d 883, 960; *People* v. *Frierson* (1979) 25 Cal.3d 142, 180 [158 Cal.Rptr. 281, 599 P.2d 587]) and the 1978 initiative (*People* v. *Malone, supra,* 47 Cal.3d 1, 59; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1285 [232 Cal.Rptr. 849, 729 P.2d 115]).

F. *Proportionality Review.*

Defendant contends his death sentence is disproportionate to his individual culpability within the meaning of *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-482 [194 Cal.Rptr. 390, 668 P.2d 697], and *In re Lynch* (1972) 8 Cal.3d 410, 423-429 [105 Cal.Rptr. 217, 503 P.2d 921]. But he offers no persuasive analysis of the facts to support this claim, and our reading of the record refutes it.

He next argues that the 1977 death penalty legislation violated the cruel and/or unusual punishment clause because it did not provide for "intercase" proportionality review. The claim has been rejected both by the United States Supreme Court (*Pulley* v. *Harris* (1984) 465 U.S. 37, 51-53 [79 L.Ed.2d 29, 40-42, 104 S.Ct. 871]) and by this court (*People* v. *Frierson, supra,* 25 Cal.3d 142, 180-184; *People* v. *Jackson* (1980) 28 Cal.3d 264, 317 [168 Cal.Rptr. 603, 618 P.2d 149]), and it also lacks merit under the 1978 initiative (*People* v. *Allen, supra,* 42 Cal.3d at p. 1285).

Finally, defendant urges that the 1977 legislation violated the equal protection clause because it denied to capital defendants the comparative sentence review that is granted to noncapital defendants by section 1170, subdivision (f). We rejected an identical claim as to the 1978 initiative in *People* v. *Allen, supra,* 42 Cal.3d at pages 1286-1288, and our reasons are equally applicable to the 1977 legislation.

The judgment is affirmed.

Lucas, C. J., and Panelli, J., concurred.

**KAUFMAN, J.,** Concurring.— ██ ██ ██ ██ ██ ██
██ ██ ██ ██ ██ ██ ██ ██ ██ I concur
in the judgment and most of what is stated in the majority opinion, includ-
ing that defendant has failed to satisfy the third prong of the *Duren* test
(*Duren* v. *Missouri* (1979) 439 U.S. 357 [58 L.Ed.2d 579, 99 S.Ct. 664]). I
cannot agree, however, with the conclusion stated in the opinion's dicta that
the question of whether defendant established a prima facie case of an
unrepresentative jury venire is properly determined here on the basis of the
gross population figures presented and that henceforth defendants must
establish such a prima facie case by presenting jury eligible statistics only
where the defendant "has access to census or other demographic data that
reflect the percentage of the relevant group who are adult and thus pre-
sumptively jury eligible. . . ." (Maj. opn., at p. 526, fn. 12, italics omitted.)

The establishment of a prima facie case means the presentation of such
proof as will support a ruling or order in favor of the moving party if no
controverting evidence is presented. It would seem too obvious to require
articulation that no prima facie case can be established by irrelevant
evidence.

In a recent United States Supreme Court decision dealing with a minority
set-aside provision for government subcontracts, a majority of the high
court made plain that to be relevant to a claim of discrimination, statistical
data must be based on the "relevant population," those persons having the
essential qualifications of the class claimed to have been excluded. (*City of
Richmond* v. *J.A. Croson Co.* (1989) 488 U.S. 469 [102 L.Ed.2d 854, 109
S.Ct. 706].)

The Court of Appeals in that case had held that the city's 30 percent set-
aside was chosen arbitrarily because it was tied to the total minority popula-
tion of Richmond and "was not tied to the number of minority subcontrac-
tors in Richmond or to any other relevant number." (*City of Richmond,
supra,* 488 U.S. at p. __ [102 L.Ed.2d at p. 877].) The Supreme Court
agreed.

In part III B of the opinion, Justice O'Connor speaking for the court
stated: "Reliance on the disparity between the number of prime contracts
awarded to minority firms and the minority population of the city of Rich-
mond is . . . misplaced. There is no doubt that '[w]here gross statistical
disparities can be shown, they alone in a proper case may constitute prima

facie proof of a pattern or practice of discrimination' under title VII. *Hazelwood School Dist.* v. *United States,* 433 U.S. 299, 307-308, 53 L.Ed.2d 768, 97 S.Ct. 2736 (1977). But it is equally clear that '[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value.' *Id.*, at 308, fn. 13, 53 L.Ed.2d 768, 97 S.Ct. 2736. See also *Mayor* v. *Educational Equality League,* 415 U.S. 605, 620, 39 L.Ed.2d 630, 94 S.Ct. 1323 (1974) ('[T]his is not a case in which it can be assumed that all citizens are fungible for purposes of determining whether members of a particular class have been unlawfully excluded').

"In the employment context, we have recognized that for certain entry level positions or positions requiring minimal training, statistical comparisons of the racial composition of an employer's workforce to the racial composition of the relevant population may be probative of a pattern of discrimination. See *Teamsters* v. *United States,* 431 U.S. 324, 337-338, 52 L.Ed.2d 396, 97 S.Ct. 1843 (1977) (statistical comparison between minority truck drivers and relevant population probative of discriminatory exclusion). *But where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task.* See *Hazelwood, supra,* at 308, 53 L.Ed.2d 768, 97 S.Ct. 2736; *Johnson* v. *Transportation Agency,* 480 U.S. 616, 651-652, 94 L.Ed.2d 615, 107 S.Ct. 1442 (1987) (O'Connor, J., concurring).

"In this case, the city does not even know how many MBEs in the relevant market are qualified to undertake prime or subcontracting work in public construction projects. Compare *Ohio Contractors Assn.* v. *Keip,* 713 F.2d at 171 (relying on percentage of minority *businesses* in the State compared to percentage of state purchasing contracts awarded to minority firms in upholding set-aside.) Nor does the city know what percentage of total city construction dollars minority firms now receive as subcontractors on prime contracts let by the city. [¶] . . . Without any information on minority participation in subcontracting, it is quite simply impossible to evaluate overall minority representation in the city's construction expenditures.

"The city and the District Court also relied on evidence that MBE membership in local contractors' associations was extremely low. Again, standing alone this evidence is not probative of any discrimination in the local construction industry. . . .

"For low minority membership in these associations to be relevant, the city would have to link it to the number of local MBEs eligible for member-

ship. If the statistical disparity between eligible MBEs and MBE membership were great enough, an inference of discriminatory exclusion could arise. . . ." (*City of Richmond, supra,* 488 U.S. at pp. __-__ [102 L.Ed.2d at pp. 886-888], first italics added.)

Similarly in the case at bench only adults are eligible for jury service, but defendant has attempted to make a prima facie showing of systematic exclusion of Black persons from jury venires on the basis of gross statistical data not based on the relevant population, i.e., "jury eligible persons," but rather on the total Black population of Contra Costa County.[1]

No rational inference of systematic exclusion can arise from the statistics presented and no prima facie case was made by defendant. Here, it was, and in the future it will be, the burden of the defendant to make out a prima facie case by presenting relevant evidence consisting of statistics based on the "relevant population," persons eligible for jury service.

ARGUELLES, J.,* Concurring and Dissenting.— 

I concur in the majority opinion in all respects, with the exception of its affirmance of defendant's conviction for violation of Penal Code section 12021 (hereafter section 12021), possession of a concealable firearm by an ex-felon. On that point, I conclude that defendant was not an "ex-felon" for purposes of the section 12021 charge because he had obtained an honorable discharge from the Youth Authority under Welfare and Institutions Code section 1772 (hereafter section 1772) following his 1972 manslaughter conviction. Section 1772 expressly provides that such an honorable discharge shall release a person "from all penalties and disabilities resulting from the offense or crime for which he or she was committed," and the Attorney General, in a formal opinion issued nearly 30 years ago, specifically concluded that section 12021 is one of the "penalties and disabilities" of which an honorable dischargee is relieved by virtue of section 1772. (See 32 Ops.Cal.Atty.Gen. 43, 45-46 (1958).) Although the Legislature later amended the somewhat analogous provisions of Penal Code section 1203.04—which govern the effect of a dismissal of charges after the successful completion of probation—to provide that a Penal Code section 1203.4 dismissal shall not affect a discharged adult probationer's status for purposes of section 12021 (Stats. 1961, ch. 1735, § 1, p. 3744), the Legislature has not yet made a similar change in section 1772. While this may be an oversight that the Legislature may want to cure in the future, until the Legislature amends the provision I believe we must apply section 1772 as it

---

[1] As the majority points out, there was evidence that about 38 percent of the total Black population were minors.

* Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

currently reads and has been interpreted. Indeed, as I read the Attorney General's brief, he has virtually conceded that, in light of the current language of section 1772 and the past authorities construing similar language, defendant's section 12021 conviction must be reversed.[1]

While I conclude defendant's section 12021 conviction must be reversed, I do not believe that this error could have prejudiced defendant at the penalty phase. Although it is true that under the court's penalty phase instructions the jury might theoretically have considered the section 12021 conviction as an aggravating factor, the prosecutor did not argue that the jury should view the possession-of-a-firearm conviction as a significant or even a subsidiary factor which should lead it to impose a penalty of death rather than life without possibility of parole; indeed, the prosecutor never even mentioned the section 12021 conviction in his penalty phase argument at all. Because defendant's principal culpability in this case stemmed from his violent *use* of a firearm to kill the victim rather than simply his wrongful possession of the weapon, and because the prosecutor—in discussing defendant's past conduct—strongly emphasized the numerous instances in which defendant had in the past actually *used* a firearm in a violent manner,[2] there is in my view no risk that the jury's penalty determination in this case was improperly influenced by the erroneous possession-of-a-firearm conviction.

Accordingly, while I dissent from the affirmance of the section 12021 conviction, I concur in all other aspects of the majority opinion, including the affirmance of the penalty judgment.

**MOSK, J.**—I dissent. When this cause was originally before us, I concluded in the opinion prepared for the court that the prosecutor's misconduct at the guilt phase, although serious, did not subject defendant to prejudice. Having closely considered the question again after we granted rehearing, I must depart from my former view and conclude that the misconduct cannot be deemed harmless.

The crucial issue at trial was the identity of the person who committed the crimes of murder, attempted murder, and robbery at Wolff's Jewelry

---

[1] In a supplemental brief directed in part to this issue, the Attorney General states: "Although no existing case authority is directly on point, the best reasoning supports the view that the restrictions on firearm possession contained within section 12021 do not apply to honorable dischargees."

[2] As the majority opinion notes, at the penalty phase the prosecution presented evidence of three incidents preceding the instant homicide in which the defendant had violently used a firearm: (1) his shooting and killing of Alcus Dorton in 1968, (2) his firing of three shots through the front door of Bobby Ingram's residence in 1974, resulting in the wounding of Ingram, and (3) his firing of a shot at Vicky Clark in 1974, apparently because he was angry over her refusal to purchase a gun from him.

Store on February 2, 1978. The prosecution set out to establish that defendant was the perpetrator through the testimony of three eyewitnesses. For its part, the defense attempted to show that defendant was not involved. It introduced evidence pointing to defendant's brother as the culprit. Perhaps more important, it presented the expert opinion of Dr. Robert Shomer challenging the reliability of eyewitness testimony in general and specifically the eyewitness testimony relied on by the prosecution.

As the discussion in the majority opinion demonstrates, the prosecutor engaged in misconduct that can only be characterized as deliberate and egregious.

For example, reading from a police report as he posed a question to Dr. Shomer on cross-examination, the prosecutor put before the jury a double-hearsay statement by an unidentified informant that defendant "had been observed in possession of a small-barreled gun and was cleaning the weapon the day before the crime." The prosecutor's act was plainly intentional and just as plainly improper.

Also, the prosecutor suggested to the jury that in *People v. Guzman* (1975) 47 Cal.App.3d 380 [121 Cal.Rptr. 69], the Court of Appeal implied Dr. Shomer's opinion on the unreliability of eyewitness testimony was not worthy of belief. During cross-examination, he asked Dr. Shomer: "[D]o you agree [with the *Guzman* court] that your testimony should be placed in the category of polygraph operators, hypnotists, truth drug administrators, and purveyors of general psychological theories?" In closing argument, he remarked: "Okay. Just a couple more comments on Shomer. I can't do any better than the Appellate Court did when they classified his testimony along with hypnotists, truth drug administrators, purveyors of general psychological theories." The prosecutor's characterization was clearly immaterial to the present proceeding—and even more clearly lacking in any support whatever in the opinion of the *Guzman* court (see *People v. Guzman, supra,* 47 Cal.App.3d at pp. 384-386).

Of course, prosecutorial misconduct requires reversal if it subjected the defendant to prejudice. (See, e.g., *People v. Bolton* (1979) 23 Cal.3d 208, 214-215 [152 Cal.Rptr. 141, 589 P.2d 396].) Generally, prejudice is not presumed but is determined " 'after an examination of the entire cause, including the evidence[.]' " (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], quoting former art. VI, § 4½, of Cal. Const., the predecessor of current art. VI, § 13.) Prejudice is found when "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error" (*People v. Watson, supra,* at p. 836)—or stated differently, when it is reasonably probable the error

marginally contributed to the outcome. A review of our cases reveals that "reasonable probability" as here used bears substantially the same meaning as the identical phrase employed to define the prejudice component of a claim of constitutionally ineffective assistance of counsel. A "reasonable probability" is not a probability that the error "more likely than not altered the outcome in the case" (*Strickland* v. *Washington* (1984) 466 U.S. 668, 693 [80 L.Ed.2d 674, 697, 104 S.Ct. 2052]), but simply "a probability sufficient to undermine confidence in the outcome" (*id.* at p. 694 [80 L.Ed.2d at p. 698]).

In my view, the misconduct committed by the prosecutor in this case must be considered prejudicial. To begin with, the issue of identity was not only crucial but also close. The record of the trial establishes the point. To be sure, the eyewitness testimony inculpating defendant in the crimes at Wolff's Jewelry Store was not insubstantial. But also not insubstantial was the evidence exculpating him from responsibility. The closeness of the issue of identity is confirmed by the following fact: at this second trial the jury came close to deadlock on the second day of deliberations and arrived at its verdict only on the third; on substantially similar evidence, the jury at the prior trial was unable to reach a verdict on the murder, attempted murder, and robbery charges.

Further, the prosecutor's misconduct bore directly and heavily on the issue of identity. For example, his improper reading of the unidentified informant's statement supported the challenged testimony of his eyewitnesses: "on the very eve of the events at Wolff's Jewelry Store," he insinuated, "defendant did not merely have possession of what may have been the weapon employed in the crimes, but was actually preparing it for use." Also, his improper suggestion that the *Guzman* court implied Dr. Shomer's opinion on the unreliability of eyewitness testimony was not worthy of belief undermined the defense challenge to his eyewitnesses.

Thus, the prosecutor's misconduct improperly strengthened his case on the crucial and close issue of identity and at the same time improperly weakened that of the defense. When as here the conflict between prosecution and defense is near to equal, such misconduct must be deemed to have had a prejudicial effect on the jury's balancing of inculpating and exculpating evidence and on its consequent determination of the question of guilt or innocence.

The majority, however, find no prejudice. The premise underlying their conclusion appears to be that the crucial issue of identity was not in fact close. But as shown above, the record is otherwise. It is true that defendant was identified by three eyewitnesses. But "[t]he vagaries of eyewitness

identification are well-known; the annals of criminal law are rife with instances of mistaken identification." (*United States* v. *Wade* (1967) 388 U.S. 218, 228 [18 L.Ed.2d 1149, 1158, 87 S.Ct. 1926]; see generally *People* v. *McDonald* (1984) 37 Cal.3d 351, 363-365 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].) Moreover, the record shows that the testimony of the eyewitnesses in this case is of problematical reliability.

The majority conclude no prejudice arose from the prosecutor's improper reading of the unidentified informant's statement that on the eve of the crimes in question defendant had a small-barreled gun in his possession and was in fact cleaning the weapon. In support they assert that the statement did not directly implicate defendant in the crimes. But even if the implication was not direct, it was nevertheless clear and strong.

The majority also rely on the "fact" that the unidentified informant's statement was cumulative to evidence that defendant had obtained a handgun from his father "not long before the crimes." (Maj. opn., *ante,* at p. 534.) The evidence, however, was that defendant obtained the gun in the latter part of December 1977. A statement that defendant had a gun and was in fact cleaning it *on the very eve of the crimes* is altogether different in nature and effect from evidence that defendant had obtained a gun *more than a month earlier*.

The majority next cite the trial court's admonition to the jury concerning the unidentified informant's statement. After the prosecutor read the statement and defense counsel made his objection, the court excused the jury. Defense counsel then moved for a mistrial. The court denied the motion, but decided "to strike the comment and admonish the jury to disregard it . . . ." After ordering the bailiff to bring the jury back in, the court made the following statement: "The record may reflect the jurors are all back in their assigned places. [¶] At this time, ladies and gentlemen of the jury, I'm going to let the jury go to lunch. There are matters engaging the Court's attention that are taking some time here. Rather than keep you here about the noon hour—and Mondays are busy days in Martinez, and there is a full panel of other jurors—so we'll let you get in ahead of them. [¶] At this time, however, the comments read by [the prosecutor] have been stricken by the Court from the record, and the jury is admonished to disregard those in all respects with the same force and effect as if you had never heard them, and they are not to be considered by you for any purpose whatsoever. [¶] I also would like to suggest that if we are able to get going a little bit after 1:00 o'clock, if that's not too difficult for everybody, if we're ready, try to be here at about 1:00 o'clock. [¶] Have a pleasant luncheon, and we'll see you at 1:15 at the latest."

To my mind, the prosecutor's reading of the unidentified informant's statement was of such significance to the crucial and close issue of identity as to be beyond nullification. In any event, the court's weak, casual, and nonspecific admonition, sandwiched as it was between unremarkable comments about routine court business, was manifestly unequal to the task.

Finally, the majority may be understood to rely on the trial court's general instructions to the jurors that they "must not consider as evidence, any statement of counsel made during the trial"; they "must never speculate to be true, any insinuation suggested by a question asked a witness"; and they "must not consider, for any purpose, . . . any evidence that was stricken out by the court; such matter is to be treated as though you had never heard of it." But in view of the grave prejudice inherent in the prosecutor's reading of the unidentified informant's statement, such instructions must be deemed to be too little and too late.

The majority also conclude no prejudice arose from the prosecutor's improper suggestion that the *Guzman* court implied Dr. Shomer's opinion on the unreliability of eyewitness testimony was not worthy of belief. In support they speculate that in view of the evidence presented on Dr. Shomer's qualifications and the instructions delivered on expert testimony, the jury would have understood the prosecutor's suggestion to go to the weight to be given to Dr. Shomer's opinion and not to its admissibility. I am not altogether persuaded. But even if the majority is correct, their argument proves too little: the weight to be given Dr. Shomer's opinion was crucial. That the prosecutor's suggestion—as they assert—may have called into question only the opinion itself and not its basis is of no practical importance on the record here.

The majority then assert that "[t]he impact of [the prosecutor's suggestion] may have been diminished . . . by the trial court's comment that there are times when appellate courts should be ignored . . . ." (Maj. opn., *ante,* at p. 537.) I simply cannot agree. It must be emphasized that the court did nothing at all to cure the harm threatened by the prosecutor's words. Specifically, it did not correct the suggestion or admonish the jury not to consider it for any purpose. Rather, it merely engaged in the following colloquy with counsel after defense counsel made an objection to the prosecutor's questioning of Dr. Shomer on the opinion of the *Guzman* court. "[DEFENSE COUNSEL]: Your Honor, I'm going to object. This is improper. There is no relevancy to this proceeding at all what an Appellate Court has said in another case. [¶] [THE PROSECUTOR]: Let me rephrase the question, Your Honor. [¶] [THE COURT]: I hesitate to say that I should ignore Appellate Courts, but sometimes we do."

I doubt whether the prosecutor's improper suggestion could have been "diminished" by an admonition. But I have no doubt it was not "diminished" by the court's flippant remark. Indeed, its comment can actually be understood to imply that the *Guzman* court did in fact consider Dr. Shomer's opinion on the unreliability of eyewitness testimony to be unworthy of belief.

Finally, the majority may be understood to rely on the trial court's general instructions to the jury referred to above. But in view of the grave prejudice inherent in the prosecutor's improper suggestion, such instructions must be held to have been entirely ineffectual.

For the reasons stated above, I am of the opinion that it is reasonably probable the prosecutor's deliberate and egregious misconduct marginally contributed to the verdict of guilt: on this record, his misconduct was of sufficient significance as to undermine confidence in the outcome.[1]

Accordingly, I would reverse the judgment in its entirety.

**BROUSSARD, J.**—I dissent. Defendant Ronald Lee Bell made a prima facie showing that the system by which jury venires were selected in Contra Costa County produced venires that reflected a substantial and continuous underrepresentation of the Black population of the community. In the absence of any rebuttal from the People demonstrating that the underrepresentation was legitimately caused by or served an important state interest, we should reverse defendant's convictions.[1]

---

[1] (Mosk, J.) Because I have come to the conclusion that the prosecutor's misconduct requires reversal under the "reasonable probability" test of *People* v. *Watson, supra,* 46 Cal.2d 818, I need not and do not reach the question whether the misconduct amounts to error of federal constitutional dimension. If it does, reversal follows a fortiori. The general rule is that federal constitutional error is subject to harmless-error analysis under the "beyond a reasonable doubt" test of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]—which is stricter than the *Watson* test: the exception is automatic reversal. (*Rose* v. *Clark* (1986) 478 U.S. 570, 576-579 [92 L.Ed.2d 460, 469-471, 106 S.Ct. 3101].)

[1] (Broussard, J.) I agree with Justice Arguelles that defendant was not an "ex-felon" under Penal Code section 12021 because he had obtained an honorable discharge from the Youth Authority under Welfare and Institutions Code section 1772 following his 1972 manslaughter conviction. (See Arguelles, J.,* conc. and dis. opn., *ante,* at p. 556.) Section 1772 expressly provides that an honorable dischargee is released "from all penalties and disabilities resulting from the offense or crime for which he or she was committed. . . ." As Justice Arguelles points out, even the Attorney General, in his brief, virtually concedes that defendant's section 12021 conviction should be reversed because of the language of section 1772 and past authorities construing similar language. I only differ with Justice Arguelles in that I believe defendant was prejudiced by the section 12021 conviction at the penalty phase.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

## I.

"[I]n this state the right to trial by a jury drawn from a representative cross-section of the community is guaranteed equally and independently by the Sixth Amendment to the federal Constitution and by article I, section 16, of the California Constitution. [¶] It therefore becomes the responsibility of our courts to insure that this guarantee not be reduced to a hollow form of words, but remain a vital and effective safeguard of the liberties of California citizens." (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 272 [148 Cal.Rptr. 890, 583 P.2d 748]; see *People* v. *White* (1954) 43 Cal.2d 740, 754 [278 P.2d 9].) That right is *fundamental,* and is binding on all states. (*Taylor* v. *Louisiana* (1975) 419 U.S. 522 [42 L.Ed.2d 690, 95 S.Ct. 692].)

In *Duren* v. *Missouri* (1978) 439 U.S. 357 [58 L.Ed.2d 579, 99 S.Ct. 664], the United States Supreme Court established the elements of a prima facie violation of the representative cross-section requirement. For almost four decades before *Duren,* however, the court has held that the Sixth Amendment protects the right to an impartial jury by requiring that it be drawn from a representative cross-section of the community.[2] (See *Smith* v. *Texas* (1940) 311 U.S. 128 [85 L.Ed. 84, 61 S.Ct. 164]; *Glasser* v. *United States* (1942) 315 U.S. 60 [86 L.Ed. 680, 62 S.Ct. 457]; *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217 [90 L.Ed. 1181, 66 S.Ct. 984, 166 A.L.R. 1412]; *Ballard* v. *United States* (1946) 329 U.S. 187 [91 L.Ed. 181, 67 S.Ct. 261]; *Peters* v. *Kiff* (1972) 407 U.S. 493 [33 L.Ed.2d 83, 92 S.Ct. 2163]; *Taylor* v. *Louisiana, supra,* 419 U.S. 522.) The court has done more than pay lip service to the right. As is apparent from its decisions, it views the right as serving essential functions in our society, such as promoting citizen participation in government, legitimizing the judgments of the courts, and preventing further stigmatization of racial minority groups. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 267, fn. 6.) "[E]xclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government." (*Smith* v. *Texas, supra,* 311 U.S. 128, 130 [85 L.Ed.2d 84, 86].) "Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system." (*Taylor* v. *Louisiana, supra,* 419 U.S. at p. 530 [42 L.Ed.2d at p.

---

[2] That right has also been codified in federal legislation. In the Jury Selection and Service Act (28 U.S.C. §§ 1861-1869), enacted in 1968, Congress declared, "It is the policy of the United States that all litigants in the Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from *a fair cross section of the community* in the district or division wherein the court convenes. . . ." (28 U.S.C. § 1861, italics added.) The Sixth Amendment guaranty and this statutory requirement "have been construed as functional equivalents." (*United States* v. *Hafen* (1st Cir. 1984) 726 F.2d 21, 22, fn. 1.)

698].) Excluding persons from jury service because they belong to a particular group "open[s] the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury," and makes the jury an "instrument of the economically and socially privileged." (*Thiel* v. *Southern Pacific Co., supra,* 328 U.S. at pp. 220, 224 [90 L.Ed.2d at pp. 1185-1186.)

The right to a jury drawn from a representative cross-section under the Sixth Amendment is substantive, not procedural. Its violation removes "from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented." (*Peters* v. *Kiff, supra,* 407 U.S. 493, 503-504 [33 L.Ed.2d 83, 94].) "The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts." (*Ballard* v. *United States, supra,* 329 U.S. at p. 195 [91 L.Ed. at p. 187].)

Even the best intentions of courts or legislatures cannot infringe on the fundamental right of a representative cross-section: "Tendencies, no matter how slight, toward the selection of jurors by any method other than a process which will insure a trial by a representative group are undermining processes, weakening the institution of jury trial, and should be sturdily resisted. That the motives influencing such tendencies may be of the best must not blind us to the dangers of allowing any encroachment whatsoever on this essential right." (*Glasser* v. *United States, supra,* 315 U.S. 60, 86 [86 L.Ed. 680, 707].)

Justice Mosk, writing for this court, explained that "[t]he rationale of these decisions, often unstated, is that in our heterogeneous society jurors will inevitably belong to diverse and often overlapping groups defined by race, religion, ethnic or national origin, sex, age, education, occupation, economic condition, place of residence, and political affiliation; that it is unrealistic to expect jurors to be devoid of opinions, preconceptions, or even deep-rooted biases derived from their life experiences in such groups; and hence that the only practical way to achieve an overall impartiality is to encourage the representation of a variety of such groups on the jury so that the respective biases of their members, to the extent they are antagonistic, will tend to cancel each other out." (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 266-267.)

## II.

The *Duren* court stated: "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process." (*Duren v. Missouri, supra,* 439 U.S. at p. 364 [58 L.Ed.2d at pp. 586-587].)

The *Duren* court defined "systematic exclusion," as used in the third prong, as *consistent* underrepresentation that results from the *system* of jury selection procedures. It held that petitioner's "demonstration that a large discrepancy occurred not just occasionally, but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic—that is, inherent in the particular jury-selection process utilized." (439 U.S. at p. 366 [58 L.Ed.2d at p. 588].) Combining the prongs, the *Duren* court further held that "in Sixth Amendment fair-cross-section cases, *systematic disproportion itself* demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section. The only remaining question is whether there is adequate justification for this infringement." (*Id.* at p. 368, fn. 26 [58 L.Ed.2d at p. 589], italics added.)

Defendant in this case made out a prima facie case of a violation of his right to a representative cross-section under *Duren*. He showed that Blacks, a *cognizable* class, made up about 8 percent of Contra Costa County, where he was tried. He showed *substantial underrepresentation*[3] in that Blacks constituted only 3 percent of the prospective jurors on Contra Costa County venires at the time of his trial.[4] (See maj. opn. at pp. 526-527.) He proved

---

[3] In dicta, the majority describe the "absolute disparity" test for determining when a group is underrepresented, and state that the United States Supreme Court and many federal and state courts have "accepted" this test. This seems to imply that it is the preferred test. In fact, however, the United States Supreme Court has referred to a number of tests, without adopting any particular statistical methodology to the exclusion of others (see *Alexander v. Louisiana* (1972) 405 U.S. 625, 630 [31 L.Ed.2d 536, 541, 92 S.Ct. 1221]); other federal and state courts also use a variety of tests.

Of the various tests, absolute disparity is the least satisfactory. Its likely effect in California would be to make it extremely difficult or impossible for most minority groups in most counties to establish a prima facie *Duren* violation. If we ever have to choose one test to the exclusion of others, absolute disparity is not the test we should adopt. I trust that California courts will recognize that this court does not herein adopt the absolute disparity test, nor any fixed threshold necessary to establish a prima facie case under that test.

[4] Such a disparity that is consistent over at least six months, if not longer, is certainly substantial. (See maj. opn. at pp. 526-527.) If we use the comparative disparity test, which many

*systematic exclusion* by statistical evidence that the underrepresentation of Blacks resulted from the *system* of jury selection in Contra Costa County: it was consistent for six months, and was not a chance occurrence. (See maj. opn. at p. 526.) In fact, the statistical probability that the underrepresentation was due to chance was less than six-tenths of 1 percent. (See *People* v. *Buford* (1982) 132 Cal.App.3d 288, 297 [182 Cal.Rptr. 904] [the *Buford* court took judicial notice of the composition of defendant Bell's jury venire during Buford's successful challenge to Contra Costa County's jury selection procedure].) The Court of Appeal in *Buford* found, after studying the underrepresentation in jury venires during the time of defendant's trial, that this probability was "so small as to warrant the inference, in the absence of explanation, that the disparity results from systematic exclusion." (*Ibid.* at p. 297.)[5] Since defendant proved the underrepresentation of Blacks resulted from systematic exclusion, he has made out a prima facie violation of his right to a representative cross-section.

---

courts have applied to small or medium-sized minority groups (see Kairys et al., *Jury Representativeness: A Mandate for Multiple Source Lists* (1977) 65 Cal.L.Rev. 776, 796), the disparity is well over 50 percent, which indicates that Blacks were not being represented in a fair and reasonable manner. (See, for courts that used the comparative disparity test, *United States* v. *Clifford* (8th Cir. 1981) 640 F.2d 150; *United States* v. *Yazzie* (10th Cir. 1981) 660 F.2d 422, 426-428, cert. den. (1982) 455 U.S. 923 [71 L.Ed.2d 464, 102 S.Ct. 1282]; *United States* v. *Butler* (5th Cir. 1980) 615 F.2d 685, denying rehg. of (5th Cir. 1980) 611 F.2d 1066, cert. den. (1980) 449 U.S. 830 [66 L.Ed.2d 35, 101 S.Ct. 97]; *United States* v. *Test* (10th Cir. 1976) 550 F.2d 577, 589; *United States* v. *Musto* (D.N.J. 1982) 540 F.Supp. 346; *Alexander* v. *Louisiana, supra,* 405 U.S. 625; *United States* v. *Goff* (5th Cir. 1975) 509 F.2d 825; *Stephens* v. *Cox* (4th Cir. 1971) 449 F.2d 657; *Quadra* v. *Superior Court* (N.D.Cal. 1975) 403 F.Supp. 486; *Ford* v. *Hollowell* (N.D.Miss. 1974) 385 F.Supp. 1392; *People* v. *Guzman* (1982) 89 A.D.2d 14, 24, fn. 8 [454 N.Y.S.2d 852, 859]; *State* v. *Acosta* (Ariz.Ct.App. 1980) 125 Ariz. 146, 148 [608 P.2d 83]; *State* v. *Barrow* (1977) 239 Ga. 162 [236 S.E.2d 257, 260]; *Jordan* v. *State* (Fla.Dist.Ct.App. 1974) 293 So.2d 131.)

 [5] Defendant also noted the process by which the jury venire was formulated. As stated by the court in *People* v. *Buford, supra,* 132 Cal.App.3d at pages 291-292: "From the weekly panel of prospective jurors to the ultimate venire there is a substantial dropoff. The noticed record in People v. Bell . . . reflects that about two weeks prior to trial, 468 persons, whose names were selected at random from the master list, were summoned for jury duty. Seventeen summonses were returned by the post office as undeliverable, and approximately twenty-six of the persons summoned, though neither excused nor deferred, simply failed to respond or appear. Of the remaining 425 persons who did respond or appear, approximately 159 (about 38 percent) were either deferred or excused. The net result was that of the 468 persons summoned, only 266 (about 55 percent) remained available for jury service. The commissioner testified that prior to trial approximately 47 jurors were excused or deferred for 'business hardship,' 9 for 'financial hardship,' 8 for 'family or child care problems,' 43 for 'medical reasons,' and 27 were 'on vacation or generally out of the County, like students who are attending schools out of the area.' Several persons were excused for other reasons prior to trial, and the remainder of the 159 persons were apparently excused or deferred at the time they appeared, for reasons not disclosed in the record. According to the commissioner, these figures were 'quite consistent with the excuse rate for categories of any other week.' "

## III.

The majority hold that defendant did not establish a prima facie violation of the representative cross-section right because he does not show the underrepresentation of Blacks in Contra Costa County jury venires resulted from "systematic exclusion." (Maj. opn. at p. 524.) To prove "systematic exclusion" under the third *Duren* prong, the majority require that a defendant identify the *particular aspect* of the system that is "constitutionally impermissible" and then that he prove that the constitutionally impermissible factor is the "probable cause" of the underrepresentation. (Maj. opn. at p. 524.) In addition, they hold that evidence of substantial and continued underrepresentation of a cognizable class, by itself, is insufficient to show systematic exclusion of that class when the selection procedures are facially neutral. (Maj. opn. at p. 524.) The majority are sadly mistaken.

I would hold that "systematic exclusion" is underrepresentation (as underrepresentation is defined by the second *Duren* prong) that is *consistent* and that results from the *system* of jury selection procedures. Thus, as I have stated, a defendant who demonstrates *systematic underrepresentation* of a *cognizable* class has fulfilled the three *Duren* prongs and made out a prima facie case. This view is supported by the holdings of *Duren* v. *Missouri, supra,* 439 U.S. 357, and *Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712], as well by the plain meaning of the term "systematic exclusion."

The *Duren* court held that underrepresentation that occurred regularly, in every weekly venire for almost a year, as a result of the system of jury selection procedures constituted "systematic exclusion." (*Duren* v. *Missouri, supra,* 439 U.S. at p. 366 [58 L.Ed.2d at p. 588].)[6] Such systematic underrepresentation *by itself* was sufficient to make out a prima facie violation of the defendant's right to a representative cross-section.[7] The court held that

---

[6] I cannot agree with the majority's disapproval of this court's holding in *People* v. *Harris* (1984) 36 Cal.3d 36 [201 Cal.Rptr. 782, 679 P.2d 433], that "systematic exclusion" means what *Duren* said it meant: that "the disparity is 'inherent in the particular jury-selection process utilized.' . . . [T]he underrepresentation results from the process utilized to choose jury venires—random selection from voter registration lists." (*Id.* at p. 58, citing *Duren* v. *Missouri, supra,* 439 U.S. at p. 366.)

[7] Justice Rehnquist, the lone dissenter in *Duren,* also recognized that the majority in that case were saying that disproportionate representation is enough to make out a prima facie violation of the right to a representative cross-section. He wrote: "[U]nder equal protection analysis prima facie challenges are rebuttable by proof of absence of intent to discriminate, while under Sixth Amendment analysis intent is irrelevant, but the State may show 'adequate justification' for the *disproportionate representation* of the classes being compared. We are reminded, however, that *disproportionality* may not be justified 'on merely rational grounds' and that justification requires that 'a significant state interest be manifestly and primarily

after a prima facie case had been made, the burden to justify the infringement rested with the state. (*Id.* at p. 368, fn. 26 [58 L.Ed.2d at p. 589].)

In the recent and seminal case of *Batson* v. *Kentucky, supra,* 476 U.S. 79, which involved a petit jury, the court reaffirmed that "In cases involving the venire, [it] has found a prima facie case on proof that members of the defendant's race were *substantially underrepresented* on the venire from which his jury was drawn, and that the venire was selected under a practice providing '*the opportunity for discrimination*.' " (*Id.* at p. 95 [90 L.Ed.2d at p. 86], italics added.) Similarly, the *Buford* court found a prima facie case because Buford demonstrated a consistent statistical disparity, and also suggested "*a plausible systematic explanation* for some degree of disparity, i.e., the informal procedure by which Contra Costa County goes about excusing prospective jurors from service." (132 Cal.App.3d 288, 298.)

The majority ignore not only the decisions of the United States Supreme Court but also the plain meaning of the term "systematic exclusion." The word "systematic" means that which constitutes "a system," and is characterized by "regularity" and by its "methodical" nature. (American Heritage Dict. of the English Language (1981) p. 1306, col. 2.) "Systematic exclusion" does not necessarily mean an exclusion that is "intentional" or "invidious." It does not require the use of nonneutral or "constitutionally impermissible" criteria. All it means is that the exclusion is the result of a *system* of jury selection, and that it occurs *regularly,* in contrast to exclusion which is the result of chance or random factors and consequently occurs infrequently or sporadically.[8] (See *People* v. *Morales* (1988) 48 Cal.3d 527, 577 [257 Cal.Rptr. 64, 770 P.2d 244] (dis. opn. of Broussard, J.).)

The majority cite *City of Richmond* v. *J.A. Croson Co.* (1989) 488 U.S. 469 [102 L.Ed.2d 854, 109 S.Ct. 706], to support their holding that substantial and continuous underrepresentation in jury venires—indeed, that any statistical disparity—is insufficient to show "systematic exclusion" and a violation of the right to a representative cross-section. That case does not provide an iota of authority for such a holding. In *Croson,* the court held that the City of Richmond failed to demonstrate a compelling governmental interest to justify "an unyielding racial quota," a policy which set aside 30 percent of the city's construction contracts for minority-owned businesses.

---

advanced' by the exemption criteria resulting in the *disproportionate representation*." (*Duren* v. *Missouri, supra,* 439 U.S. at p. 371 [58 L.Ed.2d at p. 591], italics added and omitted.)

 [8]The majority charge that this meaning of "systematic exclusion" would render the third *Duren* prong surplusage to the second *Duren* prong. But this meaning is obviously different from that of the second *Duren* prong, which is simply that representation of a cognizable group in defendant's venire "is not fair and reasonable." (*Duren* v. *Missouri, supra,* 439 U.S. at p. 364 [58 L.Ed.2d at p. 587].)

(*Id*. at p. __ [102 L.Ed.2d at p. 885].) The court stated that statistical disparity was relevant to show intentional discrimination, but differed from the City of Richmond's position on the issue of *which* statistics to use. It held: "[G]ross statistical disparities . . . may constitute prima facie proof of a pattern or practice of discrimination under Title VII"; but where contractors with "special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." (*Id*. at p. __ [102 L.Ed.2d at p. 887], quotations and citations omitted.)

In the instant case, I do not disagree with the majority that "[w]here a defendant has access to census or other demographic data that reflect the percentage of the relevant group who are *adult* and thus *presumptively jury eligible*," he should compare such data against the percentage of cognizable group members in the jury venire. (Maj. opn. at p. 526, fn. 12.) *Croson* provides some authority for this undisputed point, but does not support a holding that a statistical disparity based on the appropriate data is insufficient to make out a prima facie violation of the right to a representative cross-section.

The majority's erroneous definition of "systematic exclusion" betrays their inability or unwillingness to comprehend the difference between an equal protection analysis and a representative cross-section analysis. Under an equal protection analysis, the defendant must show purposeful discrimination. (See *Duren* v. *Missouri, supra,* 439 U.S. at p. 368, fn. 26 [58 L.Ed.2d at p. 589]; *Batson* v. *Kentucky, supra,* 476 U.S. 79.)[9] If he proves a prima facie case, the government may rebut the case merely by showing that neutral criteria or procedures were used. (See *Castaneda* v. *Partida, supra,* 430 U.S. 482, 495 [51 L.Ed.2d at p. 511].) In contrast, under representative cross-section analysis, the defendant need not show any discriminatory intent. (See *Duren* v. *Missouri, supra,* 439 U.S. at p. 368, fn. 26; *McCray* v. *Abrams* (2d Cir. 1984) 750 F.2d 1113, 1131-1132; *Waller* v. *Butkovich* (M.D.N.C.1984) 593 F.Supp. 942, 949.) As I have stated, he need *only* prove that a *cognizable* group is being *systematically underrepresented*.

The *Duren* case itself highlights the difference between the analyses. There the State of Missouri argued that *its* exemption criteria were facially neutral, and that the underrepresentation of women may have been due to a greater number of women qualifying for exemptions, such as teachers,

---

[9] To prove purposeful discrimination, underrepresentation may by itself be evidence of discriminatory effect and purpose. (*Duren* v. *Missouri, supra,* 439 U.S. at p. 368, fn. 26 [58 L.Ed.2d at p. 589]; see *Castaneda* v. *Partida* (1977) 430 U.S. 482, 493-495 [51 L.Ed.2d 498, 509-511, 97 S.Ct. 1272]; *Mt. Healthy City Board of Ed.* v. *Doyle* (1977) 429 U.S. 274, 287 [50 L.Ed.2d 471, 483, 97 S.Ct. 568].)

government workers, or persons over 65. (439 U.S. at p. 368 [58 L.Ed.2d at p. 589].) *The high court specifically responded that such facially neutral criteria, if they caused a significant underrepresentation, would still have to be justified by a significant state interest. (Id.* at pp. 367-369 [58 L.Ed.2d at pp. 588-590].) Absent a significant state interest, a facially neutral law that causes a substantial underrepresentation would not pass constitutional muster.

Notwithstanding the majority's mischaracterization of *Duren* (see maj. opn. at p. 529), the *Duren* court never determined whether the underrepresentation of women in Jackson County, Missouri, occurred as a result of facially neutral state exemptions or the county's automatic exemption for women. Instead, it held that whether or not the cause was facially neutral, the *system* as a whole produced a consistent underrepresentation—or systematic exclusion—of women: "The resulting disproportionate and consistent exclusion of women from the jury wheel and at the venire stage was quite obviously due to the *system* by which juries were selected. Petitioner demonstrated that the underrepresentation of women in the final pool of prospective jurors was due to the operation of Missouri's exemption criteria—whether the automatic exemption for women or other statutory exemptions—as implemented in Jackson County. Women were therefore systematically underrepresented within the meaning of *Taylor.*" (439 U.S. at p. 367 [58 L.Ed.2d at pp. 588-589], fn. omitted.) The majority ignore this.

In the instant case, Blacks were substantially underrepresented in jury venires at the time of defendant's trial, the underrepresentation was admittedly continuous over at least six months, and there was virtually no chance that the underrepresentation occurred as a result of something other than the system of jury venire selection in Contra Costa County. Given this evidence, I have no choice but to conclude that Blacks were systematically excluded from jury venires in Contra Costa County, and that defendant has established a prima facie violation of his constitutional right to a jury drawn from a representative cross-section of the community.

## IV.

The majority admit that "the county was not in compliance" with statutory—and presumably facially neutral—jury selection procedures, but are unconcerned because defendant only offers a "speculative assertion" that the county's noncompliance caused the underrepresentation of Blacks. (Maj. opn. at p. 524.) The county violated statutory procedures in two ways. First, it permitted the jury commissioner to excuse prospective jurors

without written rules and regulations governing the excusal procedures.[10] Second, it permitted the jury commissioner to excuse prospective jurors without requiring either a personal appearance or written affidavit to verify a claim.[11] In violating statutory procedure, the commissioner seemed to have excused or deferred almost anyone who claimed any hardship.[12] "The net result was that of the 468 persons summoned [in the jury venire], only 266 (about 55 percent) remained available for jury service." (*People* v. *Buford, supra,* 132 Cal.App.3d at p. 292.)

---

[10] The *Buford* court, referring to the time of defendant Bell's trial, described the procedures by which the county excused prospective jurors from service: "The jury commissioner testified that [during the time of defendant's trial] *approximately 40 percent of all prospective jurors are either excused or deferred; that less than 5 percent of those excused or deferred ever submit written verification of their asserted reasons for excuse or deferral; and that approximately 80 percent of the requests for excuses or deferral are granted over the phone by one of the commissioner's staff, without the benefit of written guidelines.*" (132 Cal.App.3d at p. 298, italics added.)

Code of Civil Procedure former section 200, provided that *the court* shall excuse a juror for "undue hardship." Code of Civil Procedure former section 201a allowed the court to delegate that power to the jury commissioner by adopting *written* rules and regulations which govern the excusal procedure. Here, however, the commissioner granted excusals to "approximately 40 percent of all prospective jurors" "without the benefit of written guidelines." (*People* v. *Buford, supra,* 132 Cal.App.3d at p. 298.) Since the court did not empower the jury commissioner by written rules to grant excusals to prospective jurors, the county violated former sections 200 and 201a.

[11] Additionally, "approximately 80 percent of the requests for excuses or deferral are granted over the phone by one of the commissioner's staff" *with no concomitant demand for personal appearance or written affidavit. (People* v. *Buford, supra,* 132 Cal.App.3d at p. 298.) This violated Code of Civil Procedure former section 246, which required the court to hear the excuse of the summoned juror or, in its discretion, accept an affidavit of excuse. These violations of the statutory jury selection procedure left the county's procedure open to abuse. This court warned before defendant's trial that "the continuing power to excuse prospective jurors on the grounds of 'suitability' and 'undue' hardship is highly discretionary in nature, and courts must be alert to prevent its abuse." (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 273.)

Since no court had issued written rules or regulations regarding jury selection procedure, not only was the commissioner not empowered to excuse jurors, but he had no guidance as to what constituted a legitimate "undue hardship" excuse under Code of Civil Procedure former section 200. Further, because the commissioner never demanded proof of an excuse as required by Code of Civil Procedure former section 246, he never knew if any given excuse was true.

[12] The *Buford* court found the following testimony of the commissioner concerning the "undue hardship" category of Code of Civil Procedure former section 200 instructive: " '[A]lthough we will not excuse someone for the year, you know, if—in discussion we will tell them if they don't receive pay [from their employers while serving] that we may defer them for this particular time because it is a cost, they will lose a day's pay, and $6 per diem will not cover it.' " (*People* v. *Buford, supra,* 132 Cal.App.3d at p. 298.)

As the *Buford* court commented, "It is doubtful that either the Legislature or the Judicial Council intended that every financial cost be treated as an 'extreme financial burden.' (Cal. Rules of Court, appen., § 4.5(b)(2).) Jury service is, after all, a duty as well as a right. . . . '[E]xcessive excuses on such grounds as sex, age, job obligations, or inadequate jury fees, can upset the demographic balance of the venire in essential respects.' (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 273.)" (*People* v. *Buford, supra,* 132 Cal.App.3d at pp. 298-299.)

Defendant's "speculative assertion" in this case actually hits the nail on the head. The violations of statutory jury selection procedures during the time of defendant's trial provided the "opportunity for discrimination" and suggested a "plausible systematic explanation" for the consistent and substantial underrepresention of Blacks. To "impose upon a defendant the burden of excluding all possible and permissible explanations for underrepresentation" in order to make out a prima facie case would be onerous, "unrealistic and contrary to applicable principles . . . ." (*People* v. *Buford, supra,* 132 Cal.App.3d at p. 298, citing *Duren* v. *Missouri, supra,* 439 U.S. at pp. 368-369 [58 L.Ed.2d at pp. 589-590], and *People* v. *Wheeler, supra,* 22 Cal.3d at pp. 286-287.)

These violations, although not necessary to make a *Duren* claim, when combined with defendant's showing of substantial and continued underrepresentation of Blacks in county jury venires, compel the conclusion that Blacks were systematically excluded from those venires, and that defendant has established a prima facie violation of his right to a representative cross-section.[13]

## V.

The right of a representative cross-section demands the *result* that venires be truly representative of the community, at least to the extent that practical reality permits. It does not require simply that facially neutral laws exist without regard for their consequences. In *Duren,* the United States Supreme Court repeated in that Sixth Amendment case what it stated years earlier: " '[S]tates remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions *so long as it may be fairly said that the jury lists or panels are representative of the community.*' " (439 U.S. at p. 367 [58 L.Ed.2d at p. 589], quoting *Taylor* v. *Louisiana, supra,* 419 U.S. at p. 538 [42 L.Ed.2d at p. 702], italics added.) The court has stated that maintaining the "broad representative character of the jury" assures "diffused impartiality." (*Taylor* v. *Louisiana, supra,* 419 U.S. at p. 530 [42

---

[13]The majority claim on page 528, footnote 16, that Contra Costa County "reformed" its jury selection procedure, but that the underrepresentation still occurred. They are mistaken again, for the county's procedures remained "essentially the same." In *People* v. *Simmons* (1985) 164 Cal.App.3d 1070, 1072-1073 [211 Cal.Rptr. 60], the court stated: "[T]he jury commissioner testified that . . . the jury selection procedures [in Contra Costa County] remained 'essentially the same' as described in *Buford*; that although one 'follow-up' is attempted where a prospective juror fails to respond to a jury summons (8.9 percent), no procedures exist to ameliorate or reduce the significant level of attrition reflected in the initial qualifying phase (26 percent). Nor is there any indication that county authorities ever invoke or implement the statutory remedies designed to compel juror compliance. (See Code Civ. Proc., §§ 204.3, subd. (b) [summoning person to complete juror questionnaire], 225 [resummoning trial juror], 238 [attachment and fine for trial juror's failure to appear].)"

L.Ed.2d at p. 698].) While the court has not ruled that a *petit* jury must "mirror the community," it has held that a jury venire must be "fairly representative of the community." (*Id.* at p. 538 [42 L.Ed.2d at p. 703].) The right of a representative cross-section is violated if this is not achieved by a jury venire, whether or not the exclusion is intentional. (See *Duren* v. *Missouri, supra,* 439 U.S. at p. 368, fn. 26; *McCray* v. *Abrams, supra,* 750 F.2d 1113, 1131-1132; *Waller* v. *Butkovich, supra,* 593 F.Supp. 942, 949.) In this way, the right maximizes the chance of obtaining a representative *petit* jury. The right helps achieve the fundamental purpose of a jury, which is to "guard against the exercise of arbitrary power" by making available "the commonsense judgment of the community." (*Taylor* v. *Louisiana, supra,* 419 U.S. at p. 530 [42 L.Ed.2d at p. 698].)

I do not share the majority's unquestioning trust that facially neutral laws are almost always valid and equitable, irrespective of the impact on racial minority groups. As I stated in dissent in *People* v. *Morales, supra,* 48 Cal.3d 527, 580-581, "Our nation's history is shadowed by too many examples of facially neutral rules which operated to exclude minority groups from their fundamental rights for us to be confident that a neutral law necessarily operates fairly. The poll tax (*Harman* v. *Forsennius* (1965) 380 U.S. 528, 543 [14 L.Ed.2d 50, 60, 85 S.Ct. 1177]), the literacy test (*Louisiana* v. *United States* (1965) 380 U.S. 145, 150 [13 L.Ed.2d 709, 713, 85 S.Ct. 817]), and gerrymandering (*Gomillion* v. *Lightfoot* (1960) 364 U.S. 339 [5 L.Ed.2d 110, 81 S.Ct. 125]) are all apparently neutral methods by which access to the franchise has been unconstitutionally impaired. States have persistently used apparently neutral standards to exclude minorities from juries. (*Hernandez* v. *Texas* (1954) 347 U.S. 475, 478-479 [98 L.Ed. 866, 870, 74 S.Ct. 667]; *Norris* v. *Alabama* (1935) 294 U.S. 587, 589 [79 L.Ed. 1074, 1076, 55 S.Ct. 579].) As early as 1886 the high court was called upon to invalidate an apparently neutral regulation which, as applied, invidiously discriminated against Chinese business people. (*Yick Wo* v. *Hopkins* (1886) 118 U.S. 356 [30 L.Ed. 220, 6 S.Ct. 1064].)"

The majority's holding does precisely what this court explicitly warned should not be done. They reduce the fundamental right of a representative cross-section to "a hollow form of words" and abrogate their responsibility to insure that it "remain a vital and effective safeguard of the liberties of California citizens." (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 272.) The motives of the majority presumably are the best, but that "must not blind us to the dangers of allowing *any encroachment whatsoever on this essential right.*" (*Glasser* v. *United States, supra,* 315 U.S. 60, 86 [86 L.Ed. 680, 707], italics added.) Tragically, the injury caused by the majority's holding "is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal

reflected in the processes of our courts." (*Ballard* v. *United States, supra,* 329 U.S. at p. 195 [91 L.Ed. at p. 187].) Their holding is inconsistent with the representative cross-section right of the Sixth Amendment, and the numerous federal and California cases interpreting that right for almost 50 years. Their holding "not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government." (*Smith* v. *Texas, supra,* 311 U.S. at p. 130 [85 L.Ed. at p. 86].) As this court has previously declared, in such a war the courts cannot be pacifists. (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 267.)

## VI.

For the reasons set forth above, I would reverse defendant's convictions.

Appellant's petition for a rehearing was denied November 30, 1989. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.